UNITED STATES of America, Plaintiff-Appellee,

v.

Robert Blaine BOYD, Defendant-Appellant.

No. 72–2620.

United States Court of Appeals, Ninth Circuit.

April 18, 1973.

4. See transcript of January 23, 1974 proceedings, p. 20.

Raymond W. Haman (argued), Lane, Powell, Moss & Miller, Seattle, Wash., for defendant-appellant.

Bruce Carter, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Kent Frizzell, Asst. Atty. Gen., Seattle, Wash.,

Edmund B. Clark, Peter R. Steenland, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before HAMLIN and DUNIWAY, Circuit Judges, and WEIGEL,* District Judge.

WEIGEL, District Judge:

This case presents a question of first impression as to the validity of Regulations of the Department of the Interior prohibiting discharges of oil into the navigable waters of the United States. As applied to the facts in this case, we have concluded that both the regulations and the statute upon which they are based are valid.

Appellant Robert Blaine Boyd was charged by information with violation of 33 U.S.C. § 1161(b)(4) which declares it to be a crime for any captain of a vessel in United States navigable waters to fail to notify immediately the "appropriate" federal agency in the event of a known "discharge of oil from such vessel."[1] Conviction may result in a fine of not more than $10,000 or imprisonment for not more than one year or both. The type of discharge which brings the provisions of paragraph (4) into operation is defined therein by reference to paragraph (2) of subsection 1161(b) which provides:

> The discharge of oil into or upon the navigable waters of the United States, . . . in harmful quantities as determined by the President under paragraph (3) of this subsection, is prohibited, except . . .
> (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulation issued under this subsection shall be consistent with maritime safety and with marine and navigation laws

and regulations and applicable water quality standards. (Emphasis added.) Paragraph (3) provides for the issuance of regulations by the President to delineate those quantities of discharges which will be "harmful to the public health or welfare of the United States, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches. . . . "

These provisions were enacted as part of the general statutory scheme embodied in section 1161 for the control of oil pollution. Section 1161 is, in turn, part of the Water Quality Improvement Act of 1970 (Pub.L. 91–224, Title I, § 102, 84 Stat. 91, 97–117, codified in 33 U.S.C. § 1151 et seq.), which amended, *inter alia*, section 11 of the Federal Water Pollution Control Act of 1956 (Ch. 518, § 1, 70 Stat. 498).

Pursuant to subsection 1161(b)(3), the President by Executive Order (Exec. Ord. #11548, July 22, 1970, 3 C.F.R. 539 (Supp.1972)) delegated to the Secretary of the Interior his regulation-making duties. On September 9, 1970, Secretary Hickel issued the Regulations which were duly noticed and eventually codified as Environmental Protection Agency, Regs., Discharge of Oil, 40 C. F.R. Part 110. Of these Regulations, subsections 110.3 and 110.6 are salient to this case.

*§ 110.3 Discharge into navigable waters harmful.*

For purposes of Section 11(b) of the Federal Act [*i. e.*, subsection 1161(b)], discharges of such quantities of oil into or upon the navigable waters of the United States or adjoining shorelines *determined to be harmful to the public health or welfare of the United States include discharges which: . . . (b) cause a film or sheen upon or discoloration of the sur-*

---

* Honorable Stanley A. Weigel, United States District Judge, Northern District of California, sitting by designation.

1. "Oil", "discharge", and "vessel" are defined in lay language under subsection 1161(a), a general "Definitions" section. Unless otherwise stated, statutory section references herein are to Title 33 of the United States Code.

*face of the water* or adjoining shore-lines. . . . (Emphasis added.)

§ *110.6 Exception for vessel engines.*

For purposes of Section 11(b) of the Federal Act, discharges of oil *from a properly functioning vessel engine* are *not* deemed to be harmful. . . . (Emphasis added.)

■ Reading the statute and regulations together, a discharge of oil from a ship is "harmful" and prohibited, if it produces a sheen on the water's surface and if it does not come from a properly functioning vessel engine. Under subsection ·1161(b)(4), any ship captain who does not immediately notify the appropriate agency of such a discharge may be criminally prosecuted. (The administrative determination of discharges "in harmful quantities", stated in Regs. §§ 110.3, 110.6, will hereafter be referred to as the "sheen test".)

· This brings us to the facts of this case. Just before trial the parties stipulated that: On September 4, 1971, Boyd was captain of the merchant ship M/V MERCATOR, a crab processing vessel which was then moored at a wharf on the Salmon Bay Waterway in Seattle. A crewman on the ship was transferring diesel fuel oil from the port to the starboard fuel tank by means of a hose. He accidentally knocked the hose out of the starboard tank, and "approximately thirty gallons" of oil were discharged into the water, causing a visibly iridescent slick or sheen on the surface. Captain Boyd knew of this spill at the time, but he failed to notify the U. S. Coast Guard or any other government agency. The next morning a Coast Guard safety patrolman noticed the oil slick around the MERCATOR and reported it.

Upon being charged with a failure to report under subsection 1161(b)(4),

Boyd had moved to dismiss the information on two grounds. His first claim was that it did not state facts sufficient to constitute an offense against the United States; his second, that paragraphs (2) and (4) of subsection 1161(b) are unconstitutional. After the filing of extensive briefs and after a hearing, the district judge granted the motion to dismiss. The prosecution filed for reconsideration, and after another hearing the judge again granted the dismissal. However, on May 2, 1972, the judge wrote a letter to the parties stating that he had decided his prior decision was erroneous. He declared that the sheen test was a "proper determination" of harmfulness of discharge " . . . and must stand unless shown to have been arbitrarily or capriciously concluded. No such showing has been made." [2] The motion to dismiss was thus finally denied, and only thereafter did the parties enter into the stipulation of facts as set out above. Since a dismissal motion raising the issues of law had been denied, the stipulation concludes: "[T]he facts set forth above, without more, provide a sufficient basis from which the Court can find, beyond a reasonable doubt, that . . . Boyd is guilty of the offense charged. . . . "

After trial to the court, the judge convicted Boyd, suspended sentence, and placed him on probation for one year.

Boyd's major contention on appeal is this: The sheen test improperly defines as "harmful" a broader class of oil discharges than Congress intended; the direct result is to make criminal a failure to report a discharge in cases where it is not harmful; therefore, the entire regulatory scheme (originally codified in 18 C.F.R. §§ 610.1–610.9, and now codified

---

2. Also pertinent is the following comment by the judge:

"I note that the basis for my oral decision was the exception to the Secretary's determination that oil discharged upon such water from a properly functioning vessel engine is not deemed to be harmful. I was not able to understand how such an oil spillage could be harmful or not depending upon the source of the spillage. I have now concluded, however, that the exception relates to a reasonably specific class and is necessary and proper if there is to be traffic upon the seas and inland navigable waters. The exception is therefore permissible."

in 40 C.F.R. §§ 110.1–110.9), of which the sheen test is the cornerstone, is invalid as an abuse of the rule-making power which Congress gave to the Executive Branch.[3] Boyd also argues that subsection 1161(b)(4) is void for vagueness.

■ We turn first to the attack on the Regulations themselves. Where a statute specifically delegates to an administrative agency the power to make rules, courts recognize a presumption that such rules, when duly noticed, are valid. *See, e. g.,* Gray v. Powell, 314 U.S. 402, 411–412, 62 S.Ct. 326, 86 L.Ed. 301 (1941); A.T. & T. Co. v. United States, 299 U.S. 232, 236–237, 57 S.Ct. 170, 81 L.Ed. 142 (1936); Pacific States Box & Basket Co. v. White, 296 U.S. 176, 186, 56 S.Ct. 159, 80 L.Ed. 138 (1935). The presumed validity of a general regulation, in contrast to that of an individual adjudication, does not require special findings. Pacific States Box & Basket Co. v. White, *supra,* at 186, 56 S.Ct. 159. This presumption is rebuttable, particularly where the governing statute is penal, upon a showing that the challenged regulation is an unreasonable exercise of the delegated power—*i.e.,* inconsistent with the statute. *See, e. g.,* Commissioner v. Acker, 361 U.S. 87, 90–92, 80 S.Ct. 144, 4 L. Ed.2d 127 (1959); United States v. Calamaro, 354 U.S. 351, 358–359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957). The burden placed on Captain Boyd is thus a heavy one, for he must show that the sheen test determination of harmfulness cannot be considered a reasonable expression of the Congressional will, even though Congress has given the Executive broad authority to make that determination.[4]

■ To meet this burden, Boyd argues at the outset that Congress did not intend all oil discharges to be deemed "harmful", and therefore there is a certain class of *de minimis* discharges to which the sanctions of subsection 1161(b)(4) do not apply. We agree. If Congress had meant the reporting requirement to apply to all discharges, it could have said so in plain language, rather than delegate determination of a "harmful" spill to the President as it did in paragraphs (2) and (3).[5]

3. Boyd does *not* question the legality of the President's delegation, by Executive Order, of his duties to the Secretary of the Interior.

4. In fact, the legislative history of the 1970 Act indicates that the Senate and House conferees gave up their efforts to specify what was harmful and decided that the President, with his considerably greater research resources, was better equipped to make that determination. During the hearings of the committee reviewing the Department's proposed regulations, after the Act's final passage, Senator Muskie remarked:

> We were troubled about the notice provisions of the law, as well as the liability provisions of the law. It was conceivable that de minimis quantities of oil ought not to be subject to the notice provisions and ought not to be subject to the penalty provisions of the law. It was difficult to define these quantities in the statute.
>
> The definition, we felt, would depend upon more extensive study than we could give, and even if we were in a position to give that kind of study, there were other reasons why such specificity ought not to be included in the law.
>
> We finally gave the authority to the President to define those quantities.

Hearings on Proposed Regulations of the Department of the Interior on Oil Pollution under the Water Quality Improvement Act of 1970 before the Subcommittee on Air and Water Pollution, Senate Committee on Public Works, 91st Cong., 2d Sess. at 34 (August 4, 1970).

5. The original House bill, H.R. 4148, would have required reporting only with respect to discharges "in *substantial* quantities". (Emphasis added.) Conf.Rep.No.91–940, 91st Cong., 2d Sess., 1970 U.S.Code Cong. and Admin.News, pp. 2712, 2713—re § 17 (b) of H.R. 4148. The Senate amendment, S. 7, prohibited *all* discharges, except where permitted by Presidential regulations consistent with maritime laws and water quality standards. *Id.* at p. 2719—re § 12(b)(1) of S. 7. Section 102 of the conference substitute struck down both versions and was eventually enacted into law. This history at least demonstrates that Congress did not deem every

The question before us is whether or not the sheen test, on the particular facts in this case, is a valid basis for distinction between those discharges which are harmful and those which are not.

■ Arguing against validity, Boyd asks the Court to judicially notice that not every quantity of oil creating a sheen or discoloration on a water surface is "harmful"; that, for example, a single drop is not harmful. Here the prosecution was for a spill of some thirty gallons. The facts in this case, not hypothetical situations, should govern our decision. *See* United States v. Raines, 362 U.S. 17, 21–23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Even assuming that Boyd might have standing to complain of hypothetical applications of the sheen test, he cannot rely upon judicial notice as to the effect of oil spills. *See* 9 Wigmore, Evidence, § 2571, pp. 547–550 (3rd ed. 1940). Boyd's argument is, therefore, speculation, unsupported by the record.

Appellant next contends that the sheen test was devised in order to achieve workable administration, thereby subverting Congressional intent. He quotes from the affidavit of Kenneth Biglane, an Interior Department administrator whose self-described duties included the formulation and direction of "national programs to respond to discharges of oil and hazardous materials and to prevent such discharges, pursuant to sections 11 and 12 of the Federal Water Pollution Control Act [i. e., §§ 1161–1162], as amended. . . ." Concerning the sheen test, the Biglane affidavit states:

> A major purpose of [this regulation] is to define discharge of oil for the purposes of the notification requirement of section . . . 1161(b)(4). For this purpose the film or sheen test is especially well suited, since its effect is to require

oil spill to be a "harmful" one, since the changes in the legislation from original introduction to final enactment were not insignificant.

notification of any oil discharges whose effect can be seen as a film or sheen of oil upon the surface of the water. Thus it is a simple matter for a responsible person to know which discharges must be reported. It has been my experience in investigating oil spills that persons at the scene, and persons responsible for the spill, are frequently unaware of how much oil has been discharged and its effect on the environment, even within very broad limits. Thus a notification requirement based on the amount discharged would be unworkable in many cases.

■■ On the basis of these observations by Biglane, appellant contends that the sheen test sacrifices statutory intent on the altar of "workability". While the Biglane affidavit does show that one reason for the sheen test was workable administration, this is by no means an irrational factor for the Department to consider. As a practical matter, the sheen test is more appropriate than, for example, a numerical test, or a determination that a "substantial" amount of spilled oil is harmful. A numerical test creates not only the inherent difficulty of accurate observation as to the quantity discharged, it also may spawn an incentive to be inaccurate so as to avoid the obligation of reporting. Moreover, if the term "substantial" were used, there would be endless confusion over its meaning. In any case, ease of administration is not an "impermissible factor" in the Department's determination. *Cf.* Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 597 (1971).

There is no evidence that the sheen test was devised to alter the meaning of the statute, or to avoid making a determination of harmfulness. On the contrary, the Biglane affidavit expressly states that "smaller spills (10 barrels or less) [6] have a seriously degrading effect

6. A barrel of oil is defined in the Biglane affidavit as 42 gallons at 60° Fahrenheit.

on the environment . . . particularly . . . [in areas] near the coastline. . . . Where a discharge of oil is large enough to cause a film or sheen on the surface of the water, it is large enough to cause significant harm to the environment." This statement is supported by reference to summaries of scientific studies attached as exhibits and is not refuted by appellant. Thus the Biglane affidavit evidences the Department's administrative assessment of enforcement problems as well as its investigation and determination of what constitutes a harmful discharge. The two considerations are not mutually exclusive.

Appellant further contends that the exception to the sheen test—i. e., "discharges of oil from a properly functioning vessel engine . . . "—demonstrates the irrationality of the sheen test itself. He points out that this exception allows a ship captain to escape the nonreporting penalty for any amount of oil spilled from a properly functioning engine, whether or not it is enough to create a sheen. In other words, the harmfulness of the spill is made to depend on its source. While at first blush this may seem a curious result, we are persuaded that the exception is reasonable. The exception relates to a specific class and, as the trial judge wrote in his letter denying Boyd's motion to dismiss, "is necessary and proper if there is to be traffic upon the seas and inland navigable waters." Footnote 2, *supra*.

Determination of harmfulness "to the public health or welfare of the United States" requires balancing the competing interests of environmental protection and unrestricted passage on navigable waters. It is precisely this balancing which the "properly functioning engines" exception reflects. Indeed, the exception was included in the Regulations at the behest of Congress. When the Regulations were originally proposed, after passage of the Act, the sheen test did not contain the exception. During committee hearings on the proposed Regulations, Senator Muskie remarked:

> .  . . At a minimum the President can and should immediately by regulation prohibit the discharge of oil which exceeds the amount normally anticipated in operation of a vessel.
> .  .  .
> It is obvious, then, that *both committees* [the House and Senate committees working on the bill] *felt that the minimal amounts of oil discharged in the normal operation of a properly functioning vessel engine ought not to be subject to the notice requirements of the law.* . . . (Emphasis added.)

> Hearings on Proposed Regulations of the Department of the Interior on Oil Pollution under the Water Quality Improvement Act of 1970, before the Subcommittee on Air and Water Pollution, Senate Committee on Public Works, 91st Cong., 2d. Sess. at 34 (Aug. 4, 1970).

After these hearings, the exception was adopted by the Department. As qualified thereby, the sheen test met no further Congressional objections.

█ We now briefly address Boyd's contention that the statute, construed together with the Regulations, violates Fifth Amendment due process of law. This claim rests on the premise that subsection 1161(b)(4), when coupled with the sheen test, is void for vagueness. *See*, Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (classic statement of vagueness doctrine). However, as has been discussed, one salutary aspect of the sheen test is the simplicity of its application. The statute and Regulation read together amount to a clear command to a ship captain: "If you can see the spill, report it!" That duty of reporting, depending as it does simply on one's sense of sight, is anything but vague. No man "of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application. . . . " *Id*.

A spill of approximately thirty gallons may seem small to some, particularly in comparison to the 1967 *Torrey Canyon* casualty off the shores of England and France, or the Santa Barbara blowout in 1969. However, Congress enacted a law of broad application when it caused the provisions of subsection 1161(b) to be triggered by any oil discharge in a "harmful" quantity. Nothing has been shown, on the facts in this case, to indicate that the Department's Regulations determining harmfulness go beyond the statutory mandate.

Judgment affirmed.