**MANUFACTURING CHEMISTS ASSOCIATION et al.**

v.

**Douglas M. COSTLE et al.**

No. 780578.

United States District Court, W. D. Louisiana, Lake Charles Division.

June 8, 1978.

Roberts B. Owen and Theodore L. Garrett, Covington & Burling, Washington D. C., Gene W. Lafitte, John M. Wilson and J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., for plaintiffs.

Robert L. Ackerly, John D. Conner, Joe G. Hollingsworth and Richard A. Flye, Sellers, Conner & Cuneo, Washington, D. C., Oliver P. Stockwell and Robert W. Clem-

ents, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., Timothy B. Atkeson, Stephen Ailes and Allan Gates, Steptoe & Johnson, Washington, D. C., for intervenors.

Thomas L. Raggio, Raggio, Farrar, Cappel & Chozen, Lake Charles, La., Frances O. Allen, Asst. U. S. Atty., Shreveport La., Donald W. Fowler, Atty., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

VERON, District Judge.

This action challenges certain regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to Section 311 of the Federal Water Pollution Control Act, ("the Act") 33 U.S.C. § 1321, as amended by the Clean Water Act of 1977, P.L. 95–217, 91 Stat. 1566. Published at 43 Fed. Reg. 10474 and promulgated as 40 C.F.R. Parts 116, 117, 118 and 119, these regulations identify some 271 chemicals as hazardous substances and thereby trigger a comprehensive reporting, liability and cleanup scheme for discharges of hazardous substances from offshore facilities, vessels and onshore facilities, including motor vehicles and rolling stock. (These regulations were originally intended to go into effect on June 12, 1978. However, on May 30, 1978, EPA amended the challenged regulations to delay their implementation until August 11 only insofar as they apply to chemical manufacturers whose operations are already regulated by the permit system established under § 402 of the Act.) Plaintiffs filed their complaint on May 11 1978, and filed a motion on May 19 seeking a preliminary injunction against enforcement of the regulations pending the outcome of this litigation.

Plaintiff/Manufacturing Chemists Association ("MCA") is a nonprofit trade association of 196 member companies representing more than 90% of the production capacity of basic industrial chemicals in the United States. The individually-named plaintiffs are members of MCA and are engaged in the production of basic industrial chemicals throughout the country. (A number of facilities which will be affected by the challenged regulations are located in or near the city in which this court sits.) Intervenors/Association of American Railroads, et al. ("AAR"), represent the interests of those involved in daily transportation of massive amounts of "hazardous substances" over the nation's railroad network. Intervenor/The Fertilizer Institute ("TFI") represents fertilizer manufacturing companies many of which, it is asserted, would be adversely affected should the challenged regulations be implemented. Defendants/Douglas M. Costle and the EPA have promulgated the regulations herein considered. Our jurisdiction in this matter is based on 28 U.S.C. §§ 1331(a), 1337 and 1361. Declaratory relief is sought under 28 U.S.C. §§ 2201 and 2202. The amount in controversy exceeds $10,000.

Plaintiffs, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, now move this court to grant a preliminary injunction barring enforcement of the challenged regulations. Plaintiffs urge that such an injunction should be granted because:

1. The regulations were promulgated in violation of certain clear legal requirements.

2. The immediate implementation of the challenged regulations on June 12 1978, would inflict serious and irreparable injury on the plaintiffs.

3. The entry of an injunctive order to stay enforcement of the regulations pending this court's final decision on the merits would not be contrary to any public interests.

The motion was heard on June 2, 1978, and the court has carefully considered the arguments presented there as well as the voluminous briefs and exhibits submitted by the parties in arriving at its decision.

In reviewing the challenged regulations the court is mindful of the far-reaching implications of its decision in the unending fight to preserve and protect both our industry and our environment. We cannot but agree fully with the underlying rationale of the National Environmental Policy

Act of 1969 as enunciated by the staffs of two separate Congressional Committees:

"Alteration and use of the environment must be planned and controlled rather than left to arbitrary decision. Alternatives must be actively generated and widely discussed. Technological development, introduction of new factors affecting the environment, and modifications of the landscape must be planned to maintain the diversity of plants and animals. Furthermore, such activities should proceed only after an ecological analysis and projection of probable effects. Irreversible or difficultly reversible changes should be accepted only after the most thorough study." Staffs of Senate Comm. on Interior & Insular Affairs & House Comm. on Science & Astronautics, Congressional White Paper on a National Policy for Environment, 90th Cong., 2d Sess., 18 (Comm.Print 1968).

There are, of course, widely divergent opinions as to the role that the judiciary should play in reviewing administrative determinations. On the one hand, the New Deal philosophy fostered a belief in the necessity of judicial deference to the administrative process because of the expertise which would be gained by experience. For example:

"First, we expect judicial review to *check* —not to *supplant*—administrative action. Review must not be so extensive as to destroy the values—expertness, specialization, and the like—which, as we have seen, were sought in the establishment of administrative agencies." U. S. Attorney General's Committee on Administrative Procedure, Administrative Procedure in Government Agencies 77 (1941).

As a result, faith in expertise led to a conception of the administrative process as one of management where it is more important that the right solution be reached than that the process be fair. (See J. Landis, The Administrative Process 39 (1938), and Jaffe, James Landis and the Administrative Process, 78 Harv.L.Rev. 319 (1964).

On the other hand, new theories have focused on the use of judicial intervention

both as a means of opening existing processes to more democratic influences and as a means of substantive control over administrative actions. Thus:

"The criticism of broad grants of administrative discretion to act in the public interest harks back to Professor Dicey's thesis that such discretion is inconsistent with the rule of law. Dicey wanted claims between the individual and the state adjudicated not in administrative tribunals (as was the case in France), but by general jurisdiction judges who would, in his view, be sensitive to the protection of the individual against arbitrariness." Hanks, Tarlock and Hanks, Environmental Law and Policy (1975) at 85.

In any event, administrative decisions must be closely scrutinized to ensure proper implementation of the policies espoused by Congress in granting certain powers to the various administrative bodies. In the final analysis, David Sive has argued convincingly:

"it is believed that in any environmental controversy involving the weighing of conflicting values, the weigher should be a court, a generalist, rather than an administrative agency whose outlook is organically developmental and provincial." Sive, The Role of Litigation in Environmental Policy: The Power Plant Siting Problem, 11 Natural Res.J. 467, 471 (1971).

It is upon this historical foundation that we approach the task of evaluating the conflict now before us.

■ The standards for reviewing a motion for preliminary injunction are well-established. To obtain the injunctive relief sought, plaintiffs must prove: (1) that there is a substantial likelihood that they will succeed on the merits of their claims; (2) that they will suffer irreparable injury if injunctive relief is not granted pending a final determination of their claims; and (3) that the granting of a preliminary injunction will not significantly injure the opposing parties or (4) the interests of the public at large. *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir., 1974); *Barrett v. Rob-*

*erts,* 551 F.2d 662 (5th Cir., 1977). Failure to establish any one of these four factors would be a fatal flaw in plaintiffs' attempt to gain their desired remedy. The court will consider the last three factors initially, before dealing with what it believes to be the pivotal issues raised by plaintiffs in the instant action.

## I.

■ Plaintiffs contend that immediate implementation of the challenged regulations would cause them irreparable injury. They base this assertion on the fact that many chemical manufacturing facilities regularly discharge waste effluents containing some of the 271 substances designated as "hazardous" by the proposed EPA regulations even though these facilities are operating under and in conformance with the National Pollutant Discharge Elimination System ("NPDES") permit procedures authorized by Section 402 of the Act, since in most cases such permits do not limit the discharge of the newly-designated substances. Thus, should the new regulations be implemented immediately, many chemical manufacturers would be subject to severe penalties for violating the new standards. Two courses are therefore available to them. They would be forced either to cease operations completely or to spend millions of dollars (over an extended period of time) to purchase and install the new control systems necessary to bring the facilities into compliance with the regulations, even before a final determination on the actual validity of the regulations has been rendered. Defendants argue that the extension of the date of implementation until August 11, as well as the fact that a mere filing of a request for an amended NPDES permit by any chemical manufacturer will immediately shield the manufacturer from liability for discharges while his permit is being acted upon, mitigate against the claim of irreparable harm.

We do not agree with defendants' assertions. First, it is highly doubtful that even a 60-day extension will give plaintiffs enough time to monitor adequately their effluent, determine what hazardous substances are, in fact, being discharged, and prepare an application for an amended permit. Second, the filing of an application is an uncertain shield at best, since the EPA may decide to grant all such applications within days after receipt by simply applying the "hazardous substances" discharge limits developed as part of the challenged regulations directly to the permits being requested. The time limits for complying with the new permits are, as yet, undetermined. Finally, this extension has no effect on dischargers of hazardous substances who, for whatever reason, have no NPDES permit.

The spectre of irreparable harm is especially frightening to Intervenors/AAR. As common carriers of goods by rail, intervenors are required by law to accept and transport all shipments offered in compliance with applicable tariffs. Interstate Commerce Act § 1(4), 49 U.S.C. § 1(4). At the same time, virtually all shipments tendered to a railroad are currently described according to the Standard Transportation Commodity Code (49 C.F.R. Part 1248), and a large percentage of the substances about to be designated as "hazardous" by the EPA would not be clearly identified by the STC Code. Moreover any attempt by a railroad to compel a shipper to provide specific identification of shipments containing substances designated as "hazardous" by the EPA would be subject to the requirements of Section 6(1) of the Interstate Commerce Act concerning the publication in tariff form of any rates, fares or charges for transportation (a lengthy and difficult process). As a result, many railroads would be in the perilous situation of not knowing whether the substances being carried are, in fact, subject to the constraints and penalties of the new regulations. It is possible under these challenged regulations that each individual railroad car may be taken as subjecting a carrier to separate potential liability for fines and penalties resulting from any discharges which may occur. Intervenors are thus in danger of being heavily penalized for discharges from "hazardous" cargoes even though (1) the composi-

tion of such cargoes may be unknown to them, and (2) they are statutorily prevented from refusing to ship such substances. Finally, the entire NPDES permit system (and the 60-day extension granted by the EPA to anyone applying for such permits) is in no way applicable to chemical carriers.

The court concludes, therefore, that plaintiffs and intervenors have met their burden of showing that immediate implementation of the new EPA regulations would result in their suffering irreparable harm. As a result, the first barrier in gaining the granting of a preliminary injunction has been surmounted.

## II.

Next, plaintiffs and intervenors must show that the granting of a preliminary injunction will not significantly injure the interests either of the opposing party or of the public. The EPA's actions in promulgating the regulations now being challenged indicate that no such injuries could be expected in the case at bar. The history of these regulations indicates that Section 311 was enacted nearly six years ago. On August 22, 1974, the EPA announced its intention to promulgate regulations pursuant to that section (39 Fed.Reg. 30466). On December 30, 1975, the EPA published proposed regulations governing hazardous substances. Interested members of the public were given until March 1, 1976 to comment on the proposed regulations. On March 13, 1978 (more than two years later), the final hazardous substance regulations were issued, with final implementation to occur ninety days thereafter.

The languor that has characterized the entire process of developing the challenged regulations indicates that immediate implementation is by no means essential to protection of the environment or the public interest. This conclusion is supported by the continued enforcement of the NPDES permit system as well as by the fact that new regulations controlling discharges of toxic pollutants are to be developed within the framework of the existing permit structure by 1984.

Accordingly, the court finds that the granting of an injunction for the six or eight weeks it will take to reach a determination on the merits of this case would not result in significant injury to the defendants or to the interests of the public. While the court does not necessarily agree with plaintiff/MCA's contention that granting the desired relief would, in fact, be a positive step in forwarding the interests of the public (though it is inclined to agree with Intervenor/TFI's assertion that its products are essential to continued adequate food production in this country and that the interruption of producing such fertilizers would be a serious blow to the public welfare), such a conclusion is not essential to the decision in this case. Rather, the court need only find that the public will not be materially harmed if the regulations are not implemented until a decision on the merits of this case is rendered. The controlling considerations are clear and conclusive in the case at bar:

> "Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable . . . the injunction usually will be granted." *Ohio Oil v. Conway*, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972 (1929).

## III.

The final and most important factor to be considered in determining whether a preliminary injunction should be granted is the likelihood that the moving parties will succeed when their claim is ultimately judged on its merits at a subsequent proceeding. While at the current stage of the judicial process the court need not make a binding determination as to the efficacy of each one of plaintiffs' assertions, it must apply much the same standards and reasoning here as it would in making a final decision on the merits.

■ In cases involving a review of agency actions:

"The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision." Environmental Law and Policy, supra, at 163.

The statutory test to be applied in determining whether an agency's actions are to be overturned is found in § 706 of the Administrative Procedure Act (5 U.S.C. § 706):

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

'(1) compel agency action unlawfully withheld or unreasonably delayed; and

'(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

'(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

'(B) contrary to constitutional right, power, privilege, or immunity;

'(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

'(D) without observance of procedure required by law;

'(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

'(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.'

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

Thus, in deciding whether plaintiffs are likely to succeed at trial, the court need not conclude that the plaintiffs would succeed in each individual attack on the regulations that they have raised in their briefs. Rather, it is sufficient for them to show that one of their many attacks will be successful at a trial on the merits and that that particular attack is, by itself, powerful enough to mandate the invalidation of the challenged regulations.

The court is, of course, cognizant of the standard of review which is to be applied in cases such as this. It has been held by the Supreme Court that, "the Secretary's decision is entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Such a presumption does not, however, conclusively decide the issue in all cases since, "that presumption is not to shield [the Secretary's] action from a thorough, probing, in-depth review." Id. Judicial review must at all times be cautious and deferential though never blindly so. In the final analysis:

"Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Id. at 416, 91 S.Ct. at 824.

The court's examination of the validity of the regulations as promulgated must take two directions. First, APA § 706(2)(A) and (C) would indicate that the initial inquiry should concern itself with whether the challenged regulations comport with the statutory mandate found in Section 311 of the Act. This is in keeping with the argument of Professor Joseph Saz, in his book *Defending the Environment* (1971), that courts should ensure that an agency is being faithful to its legislative mandate in order to further the constitutional premises of legislative supremacy. Indeed, Saz has also observed:

"Courts frequently require fuller and more open public debate (as by a remand to the legislature) in cases in which actions are about to be undertaken before important policy matters have been satisfactorily resolved." *Defending the Environment,* 115.

The second direction goes beyond examining the scope of the statutory authority under which the regulations have been promulgated.

"Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' . . . To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.* at 416, 91 S.Ct. at 823.

It is therefore with regard both for the scope of authority granted to the EPA by Section 311 and for the reasonableness with which the EPA has exercised that authority that the court proceeds to examine the most fundamental attack raised by plaintiffs in the instant action.

Plaintiffs attack EPA's selection of the one pound unit (and multiples thereof) for purposes of determining "hazardous quantities" as both contrary to the statutory mandate and arbitrary and capricious. Section 311(b)(3) of the Act prohibits discharges of hazardous substances "in harmful quantities" into navigable waters. Violations of this provision give rise to penalties, an obligation to notify the appropriate federal agency, and liability for the cost of removal under Sections 311(b)(5), (6) and (f). Determination of a "harmful quantity" is critical to the implementation of the remedial provisions. Section 311(b)(4) defines harmful quantities and directs the EPA to determine:

"those quantities of . . . any hazardous substance the discharge of which, *at such times, locations, circumstances and conditions,* will be harmful to the public health or welfare." (Emphasis added).

The EPA's attempt to implement this directive is found in Part 118 of the final regulations. The list of 271 hazardous substances is divided into 5 categories based upon their relative toxicity. EPA then chooses one pound (the smallest common commercial container size) as the "harmful quantity" for all substances in the most toxic category. Larger multiples of the one pound unit are than applied to the remaining categories in ascending order as their toxicity decreases. Thus, a discharge of one pound of a substance in category "X" is deemed to be "harmful" for purposes of triggering the provisions regarding penalties and notification, while those who discharge 10 pounds of a substance in category "A" (that category of substances slightly less toxic than those in category "X") or 100 pounds of a substance in category "B" (a group of substances which are still less toxic) will find their actions subject to the same provisions. All such quantities must have been discharged within a 24 hour period.

The final regulations, on their face, do not appear to comport with the statutory mandate. Nowhere in Part 118 do we find reference to the considerations specifically required by Section 311(b)(4). Such factors as "times, locations, circumstances and conditions" are not mentioned, nor can their influence be found in the "one pound" rule. As counsel for the plaintiffs aptly noted, the choice of a "one pound bottle" as the basic unit of trade by the chemical industry was the result of many different considerations, none of which concerns the impact of the chemical within the container on the environment. Packaging, marketing, pricing and easy use of products (the factors normally taken into account by manufacturers) have no relationship to the purposes or intentions of the Act and regulations. It would appear, then, that the EPA has not complied with the statutory requisites in promulgating the challenged regulations.

The considerations enumerated by Congress were prompted by what was thought to be a rational method for determining

actual environmental harm. If the challenged regulations fail to comply with that underlying purpose, they risk being found invalid because they are arbitrary and capricious. In the words of the EPA itself:

"The harm produced by the introduction of any pollutant to water is dependent upon the resulting concentration of that material in the water and upon receiving water characteristics. Determining harmful quantities thus requires some evaluation of probabilistic damage or harm to representative water bodies." (Preamble to 1975 proposed EPA regs. 40 Fed.Reg. 59985.)

The harm that will result from the discharge of a given amount of a hazardous substance may be determined as much by characteristics of the receiving water body as by the toxicity of the substance itself. Conditions of the receiving body which will have an impact on the concentration of the pollutant include type, flow rate and size of the water body, and salinity, hardness, alkalinity, biological population and buffering capacity of the water.

In developing its proposed regulations, EPA employed Battelle Memorial Institute of Pacific Northwest Laboratories ("Battelle"). Battelle attempted to develop a system for determining the hazard presented by the discharging of various substances based on "critical concentrations" (concentrations at which substantial harm could be expected), "critical volumes" (referring to volumes of receiving waters that would be affected), and "harmful quantities" which would cause critical concentrations if discharged into a body of water. Different "harmful quantities" for each substance were determined depending on whether the receiving body was fresh water, an estuary, or coastal water. In making its determinations, Battelle attempted to develop a system which would be workable both for the EPA and for those being regulated. The EPA rejected the Battelle report in favor of its own "one pound" system. The EPA explained that it had rejected approaches such as the one proposed by Battelle because of their:

"excessive complexity; incomplete or conflicting data; difficulty visualized in implementation." (40 Fed.Reg. 59985)

Counsel for the EPA argued that the harmful quantity test finally adopted by the regulations was chosen because it was "clear and easily comprehensible" and was therefore more easily understood by all interested parties. Counsel also urged that the "one pound" test would be an effective incentive for compliance with the notification requirements of Section 311. While it is conceivable that the test finally selected may accomplish the ends urged by the EPA, such goals should not be attained through totally arbitrary means. The Acting Chief of the U.S. Coast Guard Office of Marine Environment and Systems accurately described the "one pound" rule chosen by the EPA:

"The method for determining harmful quantity of hazardous substances, while having some merit in its simplicity, ignores the relationship between quantity discharged and the receiving water and *has no sound technical basis.*" (Letter from Capt. D. J. Riley to EPA on March 25, 1976, Plaintiffs' exhibit # 14, emphasis added.)

In order for a statutory system intended to control pollution to have any reliability and legitimacy, the tests which form the underpinnings of that system must have some rational relationship to the harm sought to be prevented. It must also treat all citizens who discharge under similar circumstances with a certain degree of uniformity. Such is not the case in the challenged regulations. First, even the EPA itself does not contend that the values chosen for enforcement of the regulations represent discharges which are harmful in fact. It simply contends that the values are easier to use than any other test developed. Second, the regulations, as finally promulgated, draw an unreasonable distinction between chemical manufacturers operating with a valid NPDES permit and those without a permit. Under the regulations, a manufacturer who applies for an amended permit (or who has been granted a permit)

may discharge hazardous substances in amounts far in excess of the quantities which the EPA has deemed to be hazardous without in any way triggering the notification and penalty provisions. On the other hand, a manufacturer discharging exactly the same amount of the same hazardous substances under exactly the same circumstances may be fined heavily if it has failed to apply for a permit or if its permit has expired. (It should be noted that this disparity in enforcement cannot be justified as an incentive to manufacturers to obtain valid permits since Section 402 contains its own penalty provisions covering failures to apply for or comply with a permit.)

Defendants cite *U. S. v. Boyd,* 491 F.2d 1163 (9th Cir., 1973), as support for their assertion that a simple and easily enforceable rule for controlling pollution is valid even if there is no proof that the rule has any relationship to actual harm to the environment. In that case a ship's captain was prosecuted for not having reported the accidental discharge of 30 gallons of oil from his vessel. For purposes of Section 311(b)(4) the EPA had defined harmful quantities of oil as discharges which:

> "(a) Violate applicable water quality standards, or
>
> (b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." (40 C.F.R. § 110.3)

Defendant in the *Boyd* case attacked this "sheen test" for many of the reasons presented in the case at bar. The court upheld the "sheen test" as a valid test of "harmfulness" for purposes of enforcing notification requirements.

The court does not believe that *Boyd* is dispositive of the issues in the instant action. First, inherent in the "sheen test" is a consideration of factors other than the amount of oil discharged. Such factors as dispersibility of oil, windiness and height of seas (all relevant in determining whether an oil spill is likely to remain as a single mass) have been joined in a unitary test. In effect, the "sheen test" is a test based on results of all the underlying factors. In order for the test in *Boyd* to be analogous to the "one pound" test the ship's captain would have had to have been required to report any discharge of "one gallon" or "one barrel" of oil without regard to whether or not a "sheen" had become visible. Finally, the court in *Boyd* dealt only with the narrow issue of notification after a discharge. This court must concern itself not only with notification after the discharge of a hazardous substance, but with potentially severe penalties for the discharge itself. The court is less than certain that the court in *Boyd* would have decided as it ultimately did had it been faced with the much broader questions which are posed here.

In essence, defendants urge that the "one pound" test was adopted because any more complicated test would raise insurmountable obstacles to uniform implementation and enforcement:

> "The discharger, particularly from a transportation source, is not equipped to differentiate between large and small streams, estuaries and rivers, or rivers and lakes. Adoption of such an approach using variable harmful quantities depending on water body type or size would place dischargers in the position of facing criminal penalties for failure to immediately notify without having the means to make the determination that a violation has occurred. . . . The proposed approach, identifying a single harmful quantity applicable to all waters, provides a clear and definitive threshold for activation of the reporting requirement. The inclusion of numerous variables which may accompany a particular discharge and modify the harmful quantity would create uncertainty in the notification requirement which is unacceptable in light of the criminal penalties provisions . . . and the importance of prompt activation of response activities through such notice." 43 Fed.Reg. 10491.

The court does not agree. The distinction between fresh water, estuaries, and coastal waters proposed by the Battelle report was

a valid and workable first step in taking into consideration circumstances beyond the weight of the discharged substance. Further, the EPA could accomplish its avowed purpose of requiring compliance with the notification provisions for all substantial discharges by developing a two-stage process. Stage one could require notification after any discharges of hazardous substances in amounts exceeding the "hazardous quantities" now proposed as part of the "one pound" regulations. The second stage would trigger the penalty provisions based on an in-depth consideration of "times, locations, circumstances and conditions" in a manner which may or may not be similar to the methods recommended by Battelle. The court recognizes that its function in reviewing challenged administrative actions is not to suggest how the administrative body might have better attained its goals and implemented the underlying Congressional policies. However, the alternatives which are proposed here, when compared with the standards finally adopted by the EPA, indicate that the EPA's final regulations may well be arbitrary and capricious and have failed to carry out the policies of the statute under which they were promulgated.

## CONCLUSION

The court now holds that plaintiffs and intervenors have overcome all obstacles in their effort to gain a preliminary injunction and that the injunction should therefore be granted. The court is convinced that the granting of such relief would not result in serious harm to the public interest, while denial of an injunction might well cause irreparable harm to the plaintiffs. Further, there is a strong likelihood that plaintiffs' attack on the "one pound" test asserting that it is contrary to the statutory mandate and arbitrary and capricious would succeed at a trial on the merits. (In deciding this last issue the court makes no ruling as to the many other attacks, made by plaintiffs and intervenors in their briefs, upon the validity of the regulations. A determination on the one issue discussed at length in this opinion is sufficient for the purposes of the instant motion. Resolution of the remaining questions raised by plaintiffs is deferred until the trial of the entire matter.)

We do not view this decision as a victory for those who would pollute our waters with impunity (as some might interpret it) nor as a defeat for those who are fighting the worthy battle to protect our environment. No one could possibly be happy with a system which produces goods at the ultimate expense of the health and well-being of the inhabitants of our planet.

"The essential measure of the success of the economy is not production and consumption at all, but the nature, extent, quality, and complexity of the total capital stock, including in this the state of the human bodies and minds included in the system." Boulding, The Economics of the Coming Spaceship Earth, in Environmental Quality in a Growing Economy 3–14 (H. Jarrett ed., 1971)

Rather, we are concerned solely and completely with ensuring that regulations promulgated by a governmental body which are aimed at controlling the activities of private businesses and citizens have been developed in compliance with the relevant legislative policies and pronouncements in the area and in a manner which is not arbitrary and capricious.