**ORGULF TRANSPORT CO., Petitioner,**

v.

**UNITED STATES of America c/o United States Coast Guard Respondent.**

**Civ. A. No. C88–0049P(J).**

United States District Court,
W.D. Kentucky,
Paducah Division.

April 12, 1989.

James B. Harrison and William R. Ellis, Wood & Lamping, Cincinnati, Ohio, for petitioner.

Roger J. Marzulla and Peter W. Colby, U.S. Dept. of Justice, Land & Natural Resources Div., Lee R. Tyner, Office of Gen. Counsel, Environmental Protection Agency, Lt. Ronald Kilroy, U.S. Coast Guard, Washington, D.C., and Richard Dennis, U.S. Atty., Louisville, Ky., for respondent.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

Unlike the current 10.1 million gallon Valdez oil spill in Prince William Sound, this case involves a $100.00 fine for a five-gallon oil spill on the Ohio River. Although the spill and fine are both small, they raise important issues concerning the interpretation and enforcement of the Clean Water Act.

## FACTS

Approximately five gallons of diesel fuel spilled into the Ohio River during the refueling of a towboat operated by Plaintiff Orgulf Transport Co. (Orgulf). In accordance with its obligation under the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq. (1985), and 40 CFR Part 110.10 (1984), Orgulf notified the United States Coast Guard that a spill causing a "sheen" on the water had occurred. The Coast Guard quickly investigated and verified that there was a "very light sheen" on the water caused by the spill. The Coast Guard investigator reported that no containment or cleanup was possible due to the small amount of oil discharged and its dissipation by the river's current. The investigator also reported that he was unable to determine any environmental impact without performing tests. No tests were performed. The report was forwarded to the Second Coast Guard District which proposed a fine of 20% of the maximum allowable penalty of $5000.00.

At a hearing conducted by the Coast Guard, factual and expert testimony was presented by Orgulf attempting to prove that the spill had not harmed the environment. The only evidence presented by the government was the investigatory file containing the Coast Guard report. The hearing officer rejected Orgulf's expert's opinion that the discharge was not one which "may be harmful" and also concluded that any spill which causes a sheen is "deemed to be" harmful and subject to penalty under the Clean Water Act. Accordingly, and taking into account Orgulf's good faith efforts to minimize the discharge, the effect a penalty would have on Orgulf's ability to continue in business and the gravity of the violation, the hearing officer assessed a fine of $100.00.

Orgulf appealed the decision to the Commandant of the Coast Guard, who affirmed the hearing officer and ordered the fine be paid on the ground that a finding of actual harm to the environment in each case was not required under the 1978 amendments to Section 311 of the Clean Water Act. The Commandant reasoned that under the regulations, because the spilled diesel fuel caused a sheen, it was a spill which "may be harmful" under Section 311 and therefore was a violation. Orgulf filed a complaint for declaratory judgment in this court requesting: 1) that the decision of the Coast Guard be held arbitrary and capricious and/or unsupported by substantial evidence; 2) that the discharge be held to be a *de minimus* spill and not of a quantity which may be harmful; 3) that based upon the evidence presented at the initial hearing, find the discharge was not subject to the penal provisions of 33 U.S.C. § 1321 and 40 CFR 110.3; and 4) that based upon expert testimony presented at the hearing and "until such time as contrary testimony is presented by the Coast Guard, spills of petroleum products of a magnitude up to 42 gallons [be held to be] *de minimus* in nature and not spills of quantities which may be harmful and therefore not subject to the penal provisions" of the Clean Water Act and its regulations. (Plaintiff's Complaint at 4). The Coast Guard in its answer claims that the Commandant correctly applied the regulations and the statute and counterclaims seeking payment of the civil penalty plus late charges and interest.

## THE CLEAN WATER ACT

The Federal Water Pollution Control Act (popularly known as the Clean Water Act) was originally enacted in 1948 and significantly amended in 1972, 1977 and 1987. Congress' declared policy in passing the Act was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1985). Section 311 of the Act regulates discharges of oil and hazardous substances into waters of the United States. 33 U.S.C. § 1321 (1985).

In regulating water pollution, Congress declared that "it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States...." 33 U.S.C. § 1321. However, Congress chose not to specifically prohibit all discharges of oil. Instead, Section 311(b)(3), as originally enacted, provided:

The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States ... in *harmful quantities as determined by the President under paragraph (4) of this subsection* is prohibited....

33 U.S.C. § 1321(b)(3) (1972). (Emphasis added). Paragraph (4) of Section 311(b) as originally enacted provided:

The President shall by regulation ... determine for the purposes of this section those quantities of oil and any hazardous substances the discharge of which *at such times, locations, circumstances, and conditions, will be harmful to the public health or welfare of the United States,* including but not limited to fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

33 U.S.C. § 1321(b)(4) (1977). (Emphasis added). Thus, as originally enacted, the Act prohibited only discharges in harmful quantities. The President was authorized to determine what discharges of oil constituted a "harmful quantity." In making this determination, the President was directed to take into account the surrounding circumstances involving each spill. In response to this mandate, the President by Executive Order,[1] delegated to the Administrator of the EPA the authority to promulgate national regulations determining what quantity of discharged oil would be harmful. The regulation which followed was the "sheen test," the text of which read:

For purposes of section 11(b) of the Federal Act, discharges of such quantities of oil into or upon the navigable waters of the United States or adjoining shorelines *determined to be harmful* to the public health or welfare of the United States, at all times and locations and under all circumstances and conditions,

except as provided in section 610.6 of this part include discharges which:

(a) violate applicable water quality standards, or

(b) *Cause a film or sheen upon or discoloration of the surface of the water* or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines. 35 Fed.Reg. 14306–07 (1970). (Emphasis added).

Thus, under the regulation, any discharge of oil causing a sheen was "determined to be harmful." The practical effect of the sheen test was to treat *all* discharges of oil as violations of Section 311 because a spill of even the most miniscule quantity of oil creates a sheen.

The validity of the sheen test under the original version of Section 311 was first challenged in *United States v. Boyd,* 491 F.2d 1163 (9th Cir.1973). In reacting to the "harmful quantities" standard of original section 311, the Ninth Circuit concluded that because Congress did not specifically prohibit all discharges of oil, certain *de minimus* discharges were not prohibited.[2] *Id.* at 1167. The *Boyd* court noted that a Senate version of the bill which had prohibited "all" discharges and a House version which prohibited only "substantial" discharges had been rejected by the Conference Committee in favor of the "harmful quantities" language. *Id.* at 1167–68 n. 5. The court concluded that in adopting the "harmful quantities" standard, Congress had delegated to the President the authority to determine which discharges were *de minimus* and which were of prohibited "harmful quantities." 491 F.2d 1163, 1167–68.

Several other courts followed the *Boyd* court's reasoning in this regard. (*See United States v. Chevron Oil Co.,* 583 F.2d 1357 (5th Cir.1978); *United States v. Beat-*

---

**1.** Executive Order No. 11735 of August 3, 1973, 38 Fed.Reg. 21243; as amended by Executive Order No. 12418 of May 5, 1983, Section 1, 48 Fed.Reg. 20891.

**2.** The proceeding in *Boyd* was a criminal information charging a ship's captain with failure to report a discharge of oil in violation of Section 11(b) (the original Section 311(b)). The court

held that based on the facts before it, (a spill of 30 gallons of oil) the sheen test was a valid basis for distinguishing "between those discharges which are harmful and those which are not." *Id.* at 1168–70. The issue in the case was not whether the sheen test created an irrebuttable presumption of harm.

*ty,* 401 F.Supp. 1040 (W.D.Ky.1975); *Ward v. Coleman,* 423 F.Supp. 1352 (W.D.Okla. 1976)) including the Fifth Circuit, in *Chevron,* which held that a discharger must be afforded an opportunity to demonstrate lack of harm to the environment. 583 F.2d 1357, 1362–64.

The rationale in these cases is persuasive. If Congress had originally intended to prohibit all discharges under the Clean Water Act it would have done so specifically rather then relying on the executive branch to determine which quantities were harmful.

In 1978 Congress amended the Act. The language "in harmful quantities" was changed to read "in such quantities as may be harmful." The pertinent provisions of Section 311 as amended read:

(b)(3) The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States ... in such quantities as *may be harmful as determined by the President under paragraph (4) of this subsection* is prohibited....

(b)(4) The President shall by regulation determine for the purposes of this section those quantities of oil and any hazardous substances the discharge of which *may be harmful* to the public health or welfare.... (Emphasis added).

The Coast Guard contends that the effect of the 1978 amendment is to make the issue of environmental harm irrelevant in the inquiry of whether Section 311 has been violated. Orgulf, on the other hand, claims that even under the 1978 amendment, a spill is only prohibited if it is actually harmful to the environment. This appears to be the first time the issue of the sheen test's validity under the 1978 amendment has been squarely before a court.

## DISCUSSION

In determining whether the sheen test oversteps its statutory authorization, the court encounters a statute containing a Congressional declaration of policy that there should be no discharges of oil; *see supra,* yet with no specific prohibition of all discharges of oil. Instead, Section 311 prohibits all discharges of oil which *may be harmful* as determined by the President.

In enacting the original "harmful quantities" standard, Congress intended to create a rebuttable presumption. *See Boyd* and *Chevron, supra.* The President was charged with the task of determining which quantities of oil would be harmful if spilled into waters of the United States. Because a discharge was prohibited only if it *was* harmful, the sheen test, as interpreted by the courts, created a rebuttable presumption only; the discharger was afforded an opportunity to refute the presumption of harm.

■ Under the plain reading of the "may be harmful" language, the President is empowered to prohibit a quantity which if discharged *may* be harmful. Thus, to be prohibited, the discharge need not actually *be* harmful; it is prohibited if it *may* be harmful.

■ By regulation EPA has determined that any discharge of oil which creates a sheen "may be harmful." Orgulf claims that all spills of oil, even *de minimus* spills, create a sheen and that because Congress did not prohibit all spills, a spill must be harmful to be prohibited. However, that Congress could have prohibited all discharges through a specific declaration and chose not to do so does not negate the effect of the amendment, a common sense reading of which illustrates that Congress chose to prohibit discharges which *might not be* harmful. It follows that the sheen test is within the authority delegated to the executive. Whether a spill resulted in actual harm to the environment is irrelevant to the determination of whether Section 311's prohibition of discharges of oil in quantities which may be harmful has been violated. The only pertinent inquiry is whether the spill was in a quantity which may be harmful as determined by the EPA. Because EPA has determined that a spill of oil which creates a sheen is a quantity which "may be harmful," such a spill is subject to the penalty provisions of 33 U.S.C. § 1321 and 40 CFR Part 110.3.

Orgulf's spill occurred on June 5, 1986, after the 1978 amendments were enacted but before EPA had changed the language of the regulation to reflect the new standard. Thus, Orgulf was cited under the new statute but the old regulatory language cited above.[3] However, the Coast Guard applied the old regulation as an irrebuttable presumption, reflecting their interpretation of the effect of the 1978 amendment.

■ The amendment of Section 311 was intended to broaden the reach of the section. *United States v. Healy Tibbitts*, 713 F.2d 1469 (9th Cir.1983). Following the *Healy Tibbitts* court, there appears to be "nothing in the statute or the legislative history of the 1978 amendment indicating that Congress intended the operation of the new standard to be conditioned on the promulgation of new regulations." *Id.* at 1477. Under this broadened statute, the Coast Guard was well within its delegated authority in concluding that a spill presumed to be harmful under the old statute was also a spill which may be harmful under the new. Under these circumstances the court is not required to give the old regulatory language the same interpretation required by the original statute. The delay in the tracking regulatory modification does not prevent the agency from applying its regulation so as to give effect to a statutory amendment. *See, e.g. Texas Oil and Gas Corp. v. Watt*, 683 F.2d 427 (D.C.Cir.1982). The Coast Guard was well within the scope of authority delegated in Congress' amendment in finding Orgulf in violation of Section 311.

Congress' intent as to the need for immediate application of the new standard is reflected in the legislative history of the amendment. The amendment of Section 311 was requested by EPA because of an injunction issued by the United States District Court for the Western District of Louisiana which threatened to paralyze EPA's hazardous spill program. 24 Cong.Rec. 37,680 (1978). One of the reason's for the court's injunction was EPA's failure to follow the statutory mandate of considering "times, locations, circumstances, and conditions" in their harmful quantity determinations. Threatened with having the hazardous spill program derailed for the several years it would take to satisfy the court and make such determinations for the many hazardous substances requiring regulation, EPA suggested that Congress legislatively repair the statute, thus providing a "quick fix" and saving the hazardous spill program. In summarizing the effect of the amendment for the Senate, Senator Stafford, a member of the Senate Committee on Environmental and Public Works, stated:

The proposal clarifies the authority of the administrator in designating hazardous pollutants and determining harmful quantities of such pollutants. The amendment makes it clear that the determination of harmful quantities does not require an assessment of actual harm in the variety of circumstances in which such substances might be discharged. Rather, the determination is based on the administrator's judgment of what quantity may be harmful as a result of its chemical properties, not the circumstances of its release. This change would resolve the district court's objections to

---

**3.** EPA promulgated a new regulation to reflect the changed statutory language effective April 2, 1987. Because the Coast Guard's application of the sheen test as an irrebuttable presumption in this case is the same application used under the new regulation, for all practical purposes, the court's review of the sheen test will be the same as if the spill had occurred after the regulations were updated. The new regulation, provides:

**§ 110.3 Discharge into navigable waters of such quantities as may be harmful.**

For purposes of section 311(b) of the Act, discharges of oil into or upon the navigable waters of the United States or adjoining shore-

lines in such quantities that it has been determined *may be harmful* to the public health or welfare of the United States, except as provided in § 110.7 of this part, include discharges of oil that:

(a) Violate applicable water quality standards, or

(b) *Cause a film or sheen upon or discoloration of the surface of the water* or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines.

52 FED.REG. 10712. (Emphasis added).

the previously promulgated regulations and it would allow the basic elements of section 311 to be implemented right away. 124 Cong.Rec. 37,683 (1978).

Although the amendment was enacted to address shortcomings in the hazardous substance program not the oil spill program, because discharges of oil and hazardous substances are both regulated under Section 311, the same standard was applied to oil spills. Furthermore, Senator Stafford made the Congress aware of this fact: "[The] changes place hazardous substances on a par with oil in their relation to the major components of section 311...." *Id.*

The Coast Guard's interpretation of the old regulatory language as creating an irrebuttable presumption was not only within the contemplation of Congress, it was the policy of Congress. Nothing indicates that Congress intended the strict liability standard apply to the discharge of hazardous substances but not discharges of oil.

In arguing that a discharger of oil must be allowed to demonstrate lack of harm to the environment, Orgulf first relies on the fact that neither Congress through the statute, nor the President through his delegation of authority to the EPA, specifically prohibited all discharges of oil. Orgulf argues that in light of the absence of a specific prohibition, the reasoning of the Fifth Circuit in *Chevron* should still apply.

This rationale is unpersuasive. Since the spill in *Chevron* occurred before the passage of the 1978 amendment to Section 311, the *Chevron* court decided that case under the pre–1978 version of Section 311 which, prohibited only spills "determined to be harmful," not spills which "may be harmful."

Orgulf also relies on the Ninth Circuit's decision in *Healy Tibbitts, supra*. However that case too involved a spill occurring before the 1978 amendment. Because that court decided the case under the pre-amendment law, its statement indicating that the discharger in that case would have been permitted to present evidence regarding the lack of environmental harm is only *dicta;* it does not indicate that the Ninth Circuit has adopted the position argued by Orgulf.

Orgulf's reliance on *United States v. Chotin Transportation, Inc.*, 649 F.Supp. 356 (S.D.Ohio 1986) is also misplaced. The issue in *Chotin* was whether the actions of a hearing officer in assessing penalties for an oil spill was supported by substantial evidence, not whether the hearing officer was required to take into account evidence of harm to the environment. In *Chotin*, the discharger offered no evidence regarding environmental harm at the administrative hearing, whereupon the court found that the hearing officer's assessed penalties in the case were supported by substantial evidence. *Id.* at 362. The court stated that the discharge in that case may have been *de minimus*, indicating that it did not consider the sheen test to be an irrebuttable presumption, but it did not address whether a spill not resulting in harm was prohibited under Section 311 because the discharger never put on any evidence as to harm. *Id.* Because the issue here was not considered by the *Chotin* court, its statements indicating the relevance of a lack of harm are merely *dicta.*

Having found that the sheen test is within the Congressional mandate, this court does not need to address the basis for EPA's decision to select the sheen test as the best method of identifying discharges of oil which may be harmful to the environment. However, the regulatory history indicating the considerable investigation and research conducted by EPA in response to claims that the sheen test was too stringent is instructive. EPA specifically rejected a suggestion that it adopt a volumetric trigger of one barrel of oil (forty-two gallons) instead of the sheen test because it found the sheen test to be more effective in protecting the environment.

One [industry representative] ... has commented to EPA that the sheen test under section 311 of the CWA is too stringent and that alternative, volumetric limits would provide sufficient water quality protection at a lesser cost to the company. [The commenter] has suggested that the reportable quantity threshold be changed to 1 barrel (42 gallons), except where water quality standards are more stringent. The company maintains that spills of less than 1 barrel "rarely,

if ever, cause environmental damage."
... EPA has carefully reviewed the recent scientific literature on environmental effects of oil pollution.... *EPA believes that the literature clearly demonstrates that discharges of small quantities of oil cause environmental harm.... Many types of adverse effects from oil have been extensively documented, proving harmful effects from oil spills and chronic pollution.... Evidence from reviews of laboratory studies further demonstrates that very small amounts of oil, e.g., less than 1 mg/L (1 ppm), can have lethal and sublethal effects on a wide variety of organisms. ... The review articles and reports prepared by industry representatives that argue strongly for the [commenter's] position are either limited in their citation of scientific literature or highly selective in the conclusions drawn." 52 Fed.Reg. 10712, 10716 (1985).*

Having reviewed the evidence contained in the administrative record, the court finds that there is substantial evidence to support the hearing officer's determination that a spill of oil creating a sheen occurred in violation of Section 311 of the Clean Water Act. Orgulf has never denied that the spill occurred.

Finally, Orgulf's request that this court declare all spills of less than 42 gallons *de minimus* and not a violation of Section 311 until such time as the Coast Guard presents evidence proving that such spills are harmful, asks the court to rule on a matter not before it. In any event, with today's ruling, there remains no doubt that even *de minimus* spills are prohibited by Section 311.

Having concluded that the decision of the Coast Guard must be upheld in all respects, Orgulf's Motion for Summary Judgment is DENIED and the Motion for Summary Judgment for the United States c/o The United States Coast Guard is GRANTED.