UNITED STATES of America,
Plaintiff-Appellee,

v.

CHEVRON OIL COMPANY, The California Division, Defendant-Appellant.

No. 76–4083.

United States Court of Appeals,
Fifth Circuit.

Nov. 16, 1978.

---

Lawrence K. Benson, John C. Christian, W. Richard House, Jr., New Orleans, La., for defendant-appellant.

Leonard P. Avery, Asst. U. S. Atty., Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Michael D. Graves, Atty., Peter R. Taft, Asst. Atty. Gen., Land & Natural Resources Div., Dept. of Justice, Bruce M. Diamond, Gen. Counsel, E.P.A., Edward J. Shawaker, Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

RONEY, Circuit Judge:

This appears to be the first appellate case concerning harm to the environment within the context of the penalty provisions of the Federal Water Pollution Control Act Amendments of 1972. In this case the issue is clearly presented as to whether or not the definition of harm to the environment promulgated by the Executive Branch pursuant to the statute must yield in a particular situation when the evidence shows that no harm in fact resulted to the environment from the spill in question.

In this action brought by the United States against defendant Chevron Oil Company to enforce a civil penalty for discharging oil into the navigable waters, the district court granted summary judgment for the Government. We reverse and remand for entry of summary judgment for Chevron. The statutory scheme in question prohibits discharges of "harmful quantities" of oil, and the administrative regulations state that any spill that causes a "sheen" on the water is harmful. While we hold that the regulation establishing the "sheen test" is generally valid, it is invalid as applied to the facts of this case in which the uncontradicted evidence at the administrative hearing showed that although this spill produced a sheen, it did not have a harmful effect.

*Statutory Scheme: 33 U.S.C.A. § 1321(b) and the "Sheen Test"*

The statutory section in question, presently codified at 33 U.S.C.A. § 1321(b), was added by Congress in 1970 as part of the Water Quality Improvement Act of 1970 [Pub.L.No. 91–224, 84 Stat. 91], and amended in 1972 by the Federal Water Pollution Control Act Amendments of 1972 [Pub. L.No. 92–500, 86 Stat. 862]. It was most recently amended by the Clean Water Act of 1977 [Pub.L.No. 95–217, 91 Stat. 1593, codified at 33 U.S.C.A. § 1251 *et seq.*]. Since the changes made by the 1977 Amendment do not affect this case, we will refer in this opinion to the current version of § 1321(b).

Section 1321(b)(3) prohibits the discharge of oil *"in harmful quantities as determined by the President under"* § 1321(b)(4).[1] Section 1321(b)(4) instructs the President to issue regulations indicating "those *quantities* of oil . . . the discharge of which, at such times, locations, circumstances, and conditions, will be harmful . . . ."[2]

Enforcement of these provisions is provided for by § 1321(b)(6). When a discharge of oil in violation of § 1321(b)(3) occurs, the Coast Guard may assess the owner, operator, or person in charge of the vessel or facility a civil penalty of up to $5,000, provided that notice and an opportunity for a hearing is provided. 33 U.S.C.A. § 1321(b)(6).[3] Finally to aid in the detection of oil spills, § 1321(b)(5) requires any "person in charge" of a vessel or facility to immediately report any discharge in violation of § 1321(b)(3) to the appropriate agency. The section also provides criminal penalties for a failure to so notify.[4]

1. Section 1321(b)(3) provides in pertinent part:
 The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . *in harmful quantities as determined by the President* under paragraph (4) of this subsection is prohibited, . . . (Emphasis added).

2. Section 1321(b)(4) provides:
 The President shall by regulation, to be issued as soon as possible after October 18, 1972, determine for the purposes of this section, those quantities of oil and any hazardous substance the discharge of which, at such times, locations, circumstances, and conditions, will be harmful to the public health or welfare of the United States, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

3. That section provides in pertinent part:
 Any owner, operator, or person in charge of any onshore facility or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. Any owner, operator, or person in charge of any vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, . . . shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary.

4. Section 1321(b)(5) provides in pertinent part:
 Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person (A) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, . . . or (C) in charge of an onshore facility or an offshore facility, who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

From this summary of the statutory scheme, it is apparent that the entire regulatory structure of the Act hinges on the term "harmful quantities as determined by the President." The President exercised the authority given him by Congress and determined that "at all times and locations and under all circumstances and conditions," discharges of oil which cause "a film or sheen upon or discoloration of the surface of the water" are determined to be harmful. 40 C.F.R. § 110.3 (1977).[5] Chevron challenges the validity of this regulation known as the "sheen test" as applied to the facts of this case in which the uncontradicted evidence showed that Chevron's oil spill caused a sheen but was not "harmful."

### Chevron's Oil Spill

The facts concerning this spill were developed at an administrative hearing before the Coast Guard, a transcript of which is in the record, and are not in dispute.

Chevron is the owner-operator of an oil and gas producing structure located in Lake Salvadore in St. Charles Parish, Louisiana. This structure stands in about eleven feet of water and is approximately two miles from the nearest shore. A vent or flare pipe is found some 150 feet away. On November 7, 1972, a malfunction resulted in the discharge through the vent pipe of approximately one-half to one barrel of crude oil. Since a barrel of crude oil contains 42 gallons, 21 to 42 gallons of oil were spilled.[6] A Chevron employee corrected the malfunction and recovered about one-half barrel of the discharged oil which had remained within the casing surrounding the vent pipe. He also noticed a "slight sheen" on the water which he estimated was about 20 feet in width and 50 feet in length. Chevron notified the Coast Guard of the spill as required by § 1321(b)(5).

The Coast Guard proposed that Chevron be fined $1,000 for the oil spill pursuant to § 1321(b)(6). The statutorily guaranteed hearing was held at Chevron's request. At that hearing, the above facts were elicited from Chevron personnel, and Chevron called Dr. John Mackin as an expert witness. He was accepted by the Coast Guard "as an expert biologist in the field of marine life and marine organisms and as an expert in the effect of oil in such marine life and organisms." He testified that under the circumstances of the spill as testified to at the hearing, it was his opinion that this spill did not have a harmful effect on the environment of Lake Salvadore, despite the presence of a "sheen" upon the water. Dr. Mackin also testified that the toxicity of oil is a function of its concentration, and a sheen does not show quantity or concentration. He felt that the sheen test of 40 C.F.R. § 110.3 was inappropriate for determining the harmful effects of an oil spill.[7]

---

5. The regulation provides in full:

> § 110.3 *Discharge into navigable waters harmful.*
>
> For purposes of section 311(b) of the Federal Act [33 U.S.C.A. § 1321(b)], *discharges of such quantities of oil* into or upon the navigable waters of the United States or adjoining shorelines *determined to be harmful to the public health* or welfare of the United States, *at all times and locations and under all circumstances and conditions*, except as provided in § 110.6 of this part, *include discharges which*:
>
> (a) Violate applicable water quality standards, or
>
> (b) *Cause a film or sheen upon or discoloration of the surface of the water* or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.

(Emphasis added). The exception in § 110.6 of the Regulations is not applicable to this case. It provides that "discharges of oil from a properly functioning vessel engine are not deemed to be harmful."

6. The definition subsection of § 1321 states that " 'barrel' means 42 United States gallons at 60 degrees Fahrenheit." 33 U.S.C.A. § 1321(a)(13).

7. The relevant portions of Dr. Mackin's testimony are as follows:

> Q. [Chevron's Attorney] Now, I would like to ask you the following question as an expert: Assuming that at approximately 1:15 a. m. on the morning of November 7, 1972, approximately one half to one barrel of oil was spilled into Lake Salvadore from the vent pipe located approximately 150 feet away from the Bayou Villars Tank Battery in Lake Salvadore, the water depth being ap-

The Government did not produce any evidence at the hearing.

After the hearing, the Coast Guard confirmed the $1,000 penalty assessment, and Chevron exhausted its administrative remedies. The Government then brought this suit in district court to collect the penalty. 28 U.S.C.A. § 1355. Both sides moved for summary judgment on the basis of the undisputed facts set out above.

In addition, over Chevron's objections, the Government submitted to the district court an affidavit of Kenneth Biglane, the Director of the Division of Oil and Special Materials Control for the Environmental Protection Agency. The affidavit dealt not with the specific facts of the present spill but with the reasons for the sheen test's adoption. Mr. Biglane stated that "smaller spills [of 10 barrels or less] have a seriously degrading effect on the environment." He averred that the "environmental damage caused by discharges of oil in quantities sufficient to produce a sheen on the surface of the water has been widely recognized," and he mentioned several scientific studies and reports which supported that statement. Therefore, it was his opinion "that an oil spill sufficient to produce a film or sheen on the surface of the water is large enough to cause harm to the environment." Based on this premise and the "enforcement workability of the sheen test," he concluded that the test "is well suited to define a discharge which damages the environment . . ..″

The district court found that the differences of opinion between Chevron's expert, Dr. Mackin, and those who promulgated the sheen test regulation "would appear to be inevitable and unavoidable in any determination as subjective as the definition of harmful quantities of oil" and that these differences did not make the regulation un-

proximately 11 feet and the vent pipe being located approximately two miles from the nearest shore, and assuming that some of the oil was spilled into the casing surrounding the vent pipe, was recovered, and that some of the spilled oil created a sheen upon the waters of Lake Salvadore. Now, based on those assumptions, in your opinion did the oil spilled into Lake Salvadore which created that sheen result in any harmful effect or damage to marine life or to the ecological environment?

A. [Dr. Mackin] No, sir.

Q. Would you explain your answer, please?

A. Well, my answer is based upon the experience that I've had, the experiments that I have performed and the studies in the field which I have performed in which amounts or concentrations of oil far in excess of that shown to have been lost in this particular spill failed to have any effect whatsoever.

Q. Are you saying, Dr. Mackin, that this spill could have been five or ten times as great and there would still have been no damage?

A. Yes, sir, it could have been considerably greater.

Q. *Now, Dr. Mackin, would you agree with the following statement: "Where a discharge of oil is large enough to cause a film or sheen on the surface of the water it is large enough to cause harm to the environment"?*

A. *No, sir, I would disagree.*

Q. And would you explain your answer, please?

A. Well, first I would point out that *a sheen is not a quantification. The term "sheen" simply means a reflection. It cannot in any way either quantify the oil lost nor can it give any kind of an idea of what the concentration of oil is. The toxicity of oil is a function of its concentration,* and without that information the statement is meaningless.

Q. You talk about concentration, Dr. Mackin; is it the amount of oil that is spilled or is it the concentration of the oil in a particular area that determines whether or not an oil spill is harmful?

A. *It definitely is the concentration of oil which has to do with its capacity to do damage.*

＊ ＊ ＊ ＊ ＊ ＊

So, while you can set up on the basis of experiments and the careful measurement of the amounts of oil which you use in experimentation, and you can judge from that what, say, a half barrel of oil would do in a large lake such as Savadore, really in the last analysis after you have eliminated a number of these small amounts as really ridiculous amounts so far as the production of damage is concerned, there is only one way to determine what damage from oil is, and this is to do a study of the biota to determine whether or not damage has been done.

[Tr. 26–32, emphasis added].

reasonable or arbitrary. The judge therefore granted summary judgment for the Government, relying primarily on the Ninth Circuit case of *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973).

### United States v. Boyd and Its Progeny

*Boyd* involved a criminal prosecution for failure to report a spill of "approximately thirty gallons" in which the validity of the sheen test was challenged as applied to the § 1321(b)(5) duty to report harmful discharges. *Boyd* challenged the sheen test on the ground that it "defines as 'harmful' a broader class of oil discharges than Congress intended . . . ." *Id.* at 1166.

The Ninth Circuit upheld the sheen test on the facts of the case before it. It relied on the legislative history and the same Biglane affidavit which was submitted to the district court in the case *sub judice*. *Id.* at 1167–1169. One factor which the court found persuasive in the reporting context was the "workability" and "simplicity" of application of the sheen test:

> [O]ne salutary aspect of the sheen test is the simplicity of its application. The statute and Regulation read together amount to a clear command to a ship captain: "If you can see the spill, report it!"

*Id.* at 1169. The court also relied on Biglane's conclusion that a discharge large enough to cause a sheen is large enough to cause harm to the environment, noting that this statement was supported by the scientific studies cited in the affidavit and was not refuted by Boyd. *Id.* The court upheld the sheen test, concluding that "[n]othing has been shown, on the facts in this case, to indicate that the Department's Regulations determining harmfulness go beyond the statutory mandate." *Id.* at 1170.

Several district courts have upheld the sheen test's validity as a definition of harmfulness in suits brought by the Government to collect § 1321(b)(6) civil penalties. *See Ward v. Coleman*, 423 F.Supp. 1352, 1357–1359 (W.D.Okla.1976); *United States v. Beatty, Inc.*, 401 F.Supp. 1040, 1043–1044 (W.D.Ky.1975); *United States v. Eureka Pipeline Co.*, 401 F.Supp. 934, 942–943 (N.D. W.Va.1975). Those cases rely on *Boyd* and its reasoning without discussion of any possible distinctions between § 1321(b)(5) reporting cases and § 1321(b)(6) penalty cases. In addition, like *Boyd*, there was no proof in any of these cases that the sheen test might cover *de minimis* oil spills.[8]

These cases merely followed *Boyd* without adding anything to it. The present case requires us to analyze *Boyd* and to determine whether its reasoning is still controlling where there is evidence that the spill was not harmful even though it caused a "sheen" on the water.

### Validity of the Sheen Test as a Basis for Imposing a Civil Penalty for Chevron's Spill

 Congress could have prohibited *all* oil spills in the navigable waters of the United States. Indeed, the Senate version of the Water Quality Improvement Act of

---

8. *Ward v. Coleman, supra*, 423 F.Supp. at 1358–1359 (the court agreed with *Boyd's* conclusion that nothing was shown on the facts in the case to indicate that the sheen test goes beyond the statutory mandate); *United States v. Eureka Pipeline Co., supra*, 401 F.Supp. at 943 ("The Defendant has presented no evidence that the regulation goes beyond the authority under which it was promulgated."); *see United States v. Beatty, Inc., supra*, 401 F.Supp. at 1042, 1044 (court found *Boyd's* reasoning persuasive where the only evidence showed that the spill of 5 to 75 gallons of oil caused an oil slick of approximately 200–300 feet in diame-

ter). *Cf. United States v. Kennecott Copper Corp.*, 523 F.2d 821 (9th Cir. 1975) (in criminal prosecution for a spill of 173,800 gallons of oil the court upheld the sheen test on the basis of *Boyd* against an attack on its vagueness); *United States v. W. B. Enterprises, Inc.*, 378 F.Supp. 420 (S.D.N.Y.1974) (court, holding that the operative fact was the discharge itself, rejected defendant's contention that while its discharge of 25–30 gallons of oil into the East River created a sheen, it should not be liable for a penalty because it removed all the oil from the water and thus there was no harm).

1970 prohibited *all* discharges. *See* [1970] U.S.Code Cong. & Admin.News, p. 2691, at 2719. The House version of the bill prohibited only "substantial" discharges. *Id.* at 2692–2693, 2700, 2713–2714. The conference committee substituted the present prohibition on "harmful quantities as determined by the President." *Id.* at 2722–2723.[9] It is clear from this that certain *de minimis* discharges are not prohibited by § 1321(b).[10] Congress delegated to the President the authority to enact regulations to separate these nonprohibited *de minimis* quantities from prohibited "harmful" quantities.

Of course, instead of allowing the President to define "harmful quantities," Congress could have enacted the "sheen test" as part of § 1321(b). Had Congress done so, Chevron concedes that the sheen test would have been valid even as applied to the facts of this case. For the reasons given in the Biglane affidavit and in the *Boyd* opinion, there is a reasonable basis for the sheen test even if the test is somewhat broader than necessary to achieve the congressional objective of prohibiting only harmful oil spills.

As a *regulation*, however, the sheen test cannot be any broader than congressionally authorized. *Boyd* and its progeny upheld the sheen test because there was no evidence in those cases that the test exceeded the statutory mandate. The court in *Boyd* refused to hypothesize such a situation in the absence of proof in the record:

> Arguing against validity, Boyd asks the Court to judicially notice that not every quantity of oil creating a sheen or discoloration on a water surface is "harmful"; that, for example, a single drop is not harmful. Here the prosecution was for a spill of some thirty gallons. The facts in

this case, not hypothetical situations, should govern our decision. Even assuming that Boyd might have standing to complain of hypothetical applications of the sheen test, he cannot rely upon judicial notice as to the effect of oil spills. Boyd's argument is, therefore, speculation, unsupported by the record.

491 F.2d at 1168 (citations omitted).

In the case *sub judice*, the "hypothetical" situation mentioned in *Boyd* has become a reality. According to the uncontradicted evidence of Chevron's expert, Dr. Mackin, Chevron's spill was not harmful despite the fact that it caused a sheen. Thus it would appear that the sheen test as applied to the facts of this case exceeds the scope of the congressionally delegated authority.

We need not, however, strike down the regulation. As the court in *Boyd* found, the sheen test is very workable, and there *is* a proven scientific connection between a sheen and harmful quantities of oil. The sheen test provides a useful general criterion, but one which will occasionally cover nonprohibited *de minimis* spills. Any quantification adopted in an area such as this is liable to hit nonharmful spills in certain circumstances.

The solution to the problem can be found in the hearing provided by § 1321(b)(6). A defendant must be allowed to offer proof at that hearing that its spill was not harmful despite the presence of a sheen. By "not harmful" we mean only that the quantity of oil spilled was *de minimis*, *not* that a harmful quantity was spilled but fortunately did not *actually* cause any harm.[11] Because the sheen test provides a generally valid and useful standard, it creates a rebuttable presumption

9. A general declaration of congressional policy against discharging any oil was also inserted into the Act:
 The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, . . .
 33 U.S.C.A. § 1321(b)(1). *See also id.* § 1251.

10. *United States v. Boyd, supra,* 491 F.2d at 1167–1168 & n.5; *Ward v. Coleman, supra,* 423 F.Supp. at 1358; *United States v. Beatty, Inc., supra,* 401 F.Supp. at 1044.

11. Use of an "actual harm" test has been rejected by the courts in construing § 1321(b). *See, e. g., United States v. Atlantic Richfield Co.,* 429 F.Supp. 830, 839 (E.D.Pa.1977), *aff'd without opinion,* 573 F.2d 1303 (3rd Cir. 1978)

that any spill which causes a sheen is "harmful" and therefore prohibited by § 1321(b)(3). Evidence of a sheen thus provides a sufficient basis for the Government to assess the § 1321(b)(6) civil penalty *unless* a defendant proves that its spill was not harmful under the circumstances. If a defendant introduces such evidence, as Chevron did here through Dr. Mackin, the Government must rebut with evidence that defendant's spill was of a harmful quantity under the circumstances.[12] Since the Government in the case *sub judice* did not come forward with any evidence at the administrative hearing, the penalty cannot be enforced.

Accordingly, the district court's grant of summary judgment is reversed, and the case is remanded for entry of summary judgment for defendant Chevron.

REVERSED AND REMANDED.

(harmful quantity is determined at the time of the spill rather than after defendant's cleanup efforts, so that defendant's remedial action after a spill is irrelevant to the determination of "harmfulness"); *United States v. W. B. Enterprises, Inc.*, 378 F.Supp. 420, 422 (S.D.N.Y. 1974) (same).

**12.** We need not now decide whether the sheen test also creates only a rebuttable presumption in the context of § 1321(b)(5)'s duty to report harmful spills. While the statutory language is the same, the purpose of the reporting requirement is to enable an expeditious cleanup of the spill rather than to penalize for it, and that might allow the sheen test to serve as an irrebuttable presumption in that context. Since Chevron reported the spill and also concedes the validity of the reporting requirement even on the facts of this case, the sheen test as applied to § 1321(b)(5)'s reporting requirement is not before us.