**L.O. WARD, Appellant,**

**v.**

**William G. COLEMAN, Jr., Individually, and as Secretary of Transportation of the United States of America, Russell E. Train, Individually, and as Administrator of the Environmental Protection Agency of the United States of America, and Admiral Owen W. Silar, Individually, and as Commandant United States Coast Guard, United States of America, Appellees.**

**L.O. WARD d/b/a L.O. Ward Oil and Gas Operations, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

No. 77–1952.

United States Court of Appeals,
Tenth Circuit.

Submitted March 14, 1979.

Decided May 10, 1979.

Stephen Jones, Enid, Okl. (David Butler, Enid, Okl., on the brief), for appellant.

Michael A. McCord, Dept. of Justice, Washington, D.C. (Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D.C., Larry D. Patton, U.S. Atty., Richard F. Campbell, III, Asst. U.S. Atty., Oklahoma City, Okl., Carl Strass, Dept. of Justice, Washington, D.C., on the brief), for appellee.

Kea Bardeen, Denver, Colo. (James G. Watt, Denver, Colo., on the brief), as amicus curiae for Mountain States Legal Foundation, Independent Petroleum Ass'n of the Mountain States, and Rocky Mountain Oil and Gas Ass'n, Denver, Colo.

Harold B. Scoggins, Jr., Washington, D.C., on the brief for amici curiae Independent Petroleum Ass'n of America.

W. Bland Williamson and Terry R. Doverspike, Tulsa, Okl., on the brief for amici curiae Oklahoma Independent Petroleum Ass'n.

Fred A. Gipson, Seminole, Okl., Richard S. Roberts, Wewoka, Okl., and Richard Bohanon, Oklahoma City, Okl., on the brief for amici curiae Energy Consumers and Producers Assn.

Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

L.O. Ward (Ward) appeals from a judgment in an action seeking recovery of civil penalties assessed against him by the United States Coast Guard (Coast Guard) pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (FWPCA).

Ward is the owner and operator of L.O. Ward Oil and Gas Operations—a sole proprietorship. On March 23, 1975, oil overflowed from a drilling site located in Garfield County, Oklahoma, into Boggie Creek, which is a distant tributary of the Arkansas River.[1]

After discovering the spill, Ward immediately began clean-up operations in the area.

1. The Arkansas River is navigable in fact. Therefore, Boggie Creek, as its tributary, is also a navigable water of the United States for purposes of the FWPCA. *See*: 33 U.S.C.A 1362(7); *United States v. Ashland Oil and Transportation Co.*, 504 F.2d 1317 (6th Cir. 1974).

Ward then submitted a report of the spill to the Environmental Protection Agency. The EPA forwarded the report to the Coast Guard[2] requesting that an assessment of civil penalties be made against Ward in accordance with 33 U.S.C. § 1321(b)(6). On December 19, 1975, following notice and opportunity to be heard, the Coast Guard assessed a $500.00 penalty against Ward for discharging oil into navigable waters in violation of 33 U.S.C. § 1321(b)(3).

Ward refused to pay the assessed penalty. He appealed the administrative ruling, contending that the enforcement scheme of § 1321 violated his Fifth Amendment privilege against self-incrimination. The administrative appeal was denied. On April 13, 1976, Ward filed suit in the District Court to enjoin enforcement of the administratively assessed penalty. At the same time, Ward moved to convene a three-judge court pursuant to 28 U.S.C. § 2282 (repealed August 12, 1976).

On June 4, 1976, the United States filed a separate action in District Court to collect the unpaid penalty and moved to consolidate the two cases for trial. The District Court denied Ward's motion to convene a three-judge court and ordered the cases consolidated. Ward subsequently moved for summary judgment in both cases contending that his compulsory report under § 1321(b)(5) resulted in the automatic imposition of punitive sanctions under § 1321(b)(6) and therefore violated his privilege against self-incrimination.

In a memorandum opinion and order dated December 22, 1976, the District Court denied the motion for summary judgment in its entirety. *Ward v. Coleman*, 423 F.Supp. 1352 (W.D. Okl. 1976). The case was thereafter tried to a jury, which resulted in a verdict in favor of the Government and the assessment of a penalty against Ward in the reduced amount of $250.

On appeal, Ward contends that: (1) the trial court erred in refusing to convene a three-judge district court, and (2) the FWPCA's enforcement scheme violates the self-incrimination clause of the Fifth Amendment to the United States Constitution.

I.

Before turning to Ward's challenge based upon the self-incrimination clause of the Fifth Amendment, we must determine whether the trial court erred in refusing to convene a three-judge district court.

28 U.S.C. § 2282 requires that a three-judge court be convened in any action where a preliminary or permanent injunction is sought to restrain "the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States . . . ."[3] The purpose of § 2282 is "to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme . . . by the issuance of a broad injunction order." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963). If § 2282 applies, we must vacate the judgment and remand for consideration by a three-judge panel. *See: Federal Housing Administration v. The Darlington, Inc.*, 352 U.S. 977, 77 S.Ct. 381, 1 L.Ed.2d 363 (1957).

It is axiomatic that before § 2282 comes into play, an injunction restraining the enforcement or operation of an Act of Congress must be sought. *Flemming v. Nestor*, 363 U.S. 603, 607, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). A three-judge district court need not be convened where the constitutionality of an Act of Congress is merely "drawn in question." *Garment Workers v. Donnelly Company*, 304 U.S. 243, 58 S.Ct. 875, 82 L.Ed. 1316 (1938).

**2.** § 1321(b)(5) of 33 U.S.C. requires any person in charge of an on-shore facility to immediately notify the Coast Guard as soon as he has knowledge of any discharge of oil or other hazardous substance into the navigable waters of the United States. Failure to immediately report such a discharge subjects the offending party to criminal sanctions of not more than $10,000 or imprisonment for not more than one year, or both.

**3.** Although § 2282 has since been repealed it remains effective as to pending suits. Act of August 12, 1976, P.L. No. 94–381, 90 Stat. 1119.

■ In the instant case, a judgment for Ward in the district court would not have restrained the enforcement or operation of the FWPCA. The self-reporting aspect of the Act would not have been impaired. Likewise, civil penalties could still have been assessed provided the Government could prove its case based on evidence derived from a source wholly independent of the compelled disclosure. *Cf. Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Garment Workers v. Donnelly Co., supra*, the Court observed:

"[The predecessor of § 2282] does not provide for a case where the validity of an act of Congress is merely drawn in question, albeit that question be decided, but only for a case where there is an application for an interlocutory or permanent injunction to restrain the enforcement of an Act of Congress. . . . Had Congress intended the provision . . . , for three judges and direct appeal, to apply whenever a question of the validity of an act of Congress became involved, Congress would naturally have used the familiar phrase 'drawn in question' " . . . .

304 U.S. at 250, 58 S.Ct. at 879.

*See also: Flemming v. Nestor, supra*, 363 U.S. at 607, 80 S.Ct. 1367.

We hold that the trial court did not err in refusing to convene a three-judge district court.

## II.

As his primary ground for reversal, Ward contends that the self-reporting requirements of § 1321(b)(5) violate the self-incrimination clause of the Fifth Amendment when a report filed under that section is subsequently used to establish liability for purposes of assessing civil penalties pursuant to § 1321(b)(6).

■ It is, of course, fundamental that the Fifth Amendment protects only communi-cations which are testimonial in nature, compelled and incriminating. *See: Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The report mandated by sub-part (b)(5) is testimonial in character. *See: Andreasen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Moreover, it is clear that Ward was compelled to "notify the appropriate agency of the United States Government of [the oil] discharge" under pain of criminal prosecution. 33 U.S.C. § 1321(b)(5). Such required self-reporting has consistently been held to be compulsory for purposes of the Fifth Amendment. *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

The basic issue we must here confront is: Whether the civil penalties prescribe in sub-part (b)(6) are, in reality, criminal in nature thereby precluding use of a compelled report made pursuant to sub-part (b)(5) of § 1321.

Judicial determinations as to the civil or penal nature of a particular provision generally center around the issue of "whether the legislative aim in providing the sanction was to punish the individual for engaging in the activity involved or to regulate the activity in question." *Telephone News-System, Inc. v. Illinois Bell Telephone Company*, 220 F.Supp. 621, 630 (N.D. Ill. 1963), aff'd, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964); *Kennedy v. Mendoza-Martinez, supra; Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). In undertaking our assessment of the statutory provisions here in question, we must analyze (i) the Congressional intent discernible from the face of the statute, (ii) the enforcement mechanism of the statute, and (iii) the indicators of Congressional intent enumerated by the Supreme Court in *Kennedy v. Mendoza-Martinez, supra*.[4]

---

4. *See: Atlas Roofing Company, Inc. v. Occupational S. & H. Rev. Com'n*, 518 F.2d 990 (5th Cir. 1975), aff'd, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

## Statutory Language

The FWPCA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of these goals, Congress specifically prohibited the discharge of oil or other hazardous substances into the navigable waters of the United States and created a statutory enforcement scheme to carry out its mandates. *See:* 33 U.S.C. § 1321. Under the provisions of this enforcement scheme, every owner or operator of a discharging facility is required to immediately notify the Coast Guard of a discharge of oil or other hazardous substance. Should such an owner-operator fail to do so, he may be fined not more than $10,000, imprisoned for not more than one year, or both. 33 U.S.C. § 1321(b)(5).

In addition to this self-reporting requirement, owners and operators of discharging facilities are liable for clean-up costs, subject only to the defenses of act of God, act of war, negligence of the United States government, or act or omission of a third party. 33 U.S.C. § 1321(f). In the event that the discharged substance is determined to be "nonremovable," civil penalties may be assessed based upon toxicity, degradability, and the dispersal characteristics of the substances discharged. 33 U.S.C. § 1321(b)(2)(B). This civil penalty is again subject to the above-enumerated defenses.

Also, each owner or operator of a discharging facility is automatically assessed a "civil penalty" in an amount of not more than $5,000 for each offense. 33 U.S.C. § 1321(b)(6). The assessment of this penalty is without regard to fault and subject to no defenses. In determining the amount of the penalty, the Coast Guard is directed, by statute, to consider the "appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation . . . ." 33 U.S.C. § 1321(b)(6). The civil penalties collected pursuant to sub-part (b)(6) and the "liquidated damages provisions" found in sub-part (b)(2)(B) are deposited into a revolving fund maintained by the Government to defray the costs of administration and cleaning up oil spills in situations where the clean-up costs are otherwise not recoverable—where spills are unreported, caused by acts of God, or committed by financially insolvent persons. *See:* 33 U.S.C. § 1321(k).

The fact that the civil penalty assessed pursuant to sub-part (b)(6) forms a part of this "revolving fund" indicates its remedial nature. *See: United States v. Tex-Tow, Inc.* 589 F.2d 1310 (7th Cir. 1978); *United States v. General Motors Corporation,* 403 F.Supp. 1151 (D. Conn. 1975).

However, the statutory language dealing with the automatic assessment and determination of the amount of the penalty indicates a punitive intent. The penalty is assessed automatically in every case without regard to fault. No defenses are available. Thus, while the remedial purpose of the revolving fund is to defray the costs of administration and cleaning up of oil spills in situations where clean-up costs are otherwise not recoverable, the factors used in determining the amount of the penalty are not, in our view, reasonably related to the purposes of the revolving fund. Rather, the factors are based on a retributive and punitive motivation.

The civil penalty cannot be characterized as compensatory. The statute specifically provides for reimbursement of clean-up costs or, in the event the substances determined as "nonremovable," liquidated damages. 33 U.S.C. §§ 1321(b)(2)(B) and 1321(f). This obligation for clean-up costs does not relieve the owner or operator of the discharging facility from liability for civil penalties under § 1321(b)(6).

Thus, in our view, while the statute, on its face, tends to evidence a punitive intent, we do not consider this determination as conclusive for purposes of treating it criminal in nature. We, therefore, turn to a consideration of the remaining factors: the administrative enforcement scheme and the *Kennedy v. Mendoza-Martinez* indicators of Congressional intent.

*The Administrative Enforcement Scheme*

The authority for assessment and collection of civil penalties pursuant to sub-part (b)(6) is vested in the United States Coast Guard. 33 U.S.C. § 1321(b)(6); Executive Order No. 11735, 38 Federal Register 21243 (1973), Reprinted 33 U.S.C.A. § 1321 (Supp. 1977). By virtue of this authority, the Coast Guard issued Commandant Instruction 5922.11A dealing with the assessment of civil penalties under sub-part (b)(6). The Commandant Instruction sets out several criteria which the Coast Guard uses in determining the amount of penalty to be assessed:

> Consistent with the language of the Federal Water Pollution Control Act, Coast Guard policy *requires* the assessment of a civil penalty for each discharge of oil in violation of Section 311(b)(3) [1321(b)(3)] . . . . It is Coast Guard policy to assume that the penalty will be at or near the *maximum* unless a lesser penalty is justified by one of the factors listed in Section 311(b)(6) [1321(b)(6)].

A number of considerations may be made in determining the gravity of a violation, such as the *degree of culpability* associated with the violation, the *prior record* of the responsible party, and the *amount of oil discharged. Substantial and intentional discharges should result in severe penalties, as should cases of gross negligence, and so on.* This is not to suggest that other considerations may not combine to determine the gravity of the violation.

*Two factors should not be considered* in fixing the amount of the civil penalty: (1) *the responsible party's removal effort or expense* and (2) a decision by Federal and/or state authorities to bring criminal action for the same discharge. Liability for a civil penalty under Section 311(b)(6) [1321(b)(6)] attaches at the time of discharge. It is entirely unrelated to the subsequent removal responsibility for which the discharger must bear the ex-

pense, either directly or by reimbursing the Pollution Fund. *In no case may a responsible party avoid or reduce a civil penalty by removing the discharged oil . . . .* (Emphasis supplied.)[5]

In our view, the administrative enforcement mechanism applied by the Coast Guard clearly indicates that the assessment and determination of the amount of the penalty is based upon punitive considerations. The Coast Guard Commandant Instruction "requires the assessment of a civil penalty for each discharge of oil." The factors considered in determining the amount of the penalty are further removed from the remedial aspects of the "revolving fund" than are those factors enumerated in the statute. Among other things, the Coast Guard is to consider the degree of culpability, prior record and amount of oil discharged. Intentional discharges and those resulting from gross negligence "should result in severe penalties." A party may not "avoid or reduce a civil penalty by removing the discharged oil." This language is lacking in any "remedial" ring! The costs of investigation are not considered in assessing the amount of the penalty. Similarly, the factors involved in determining the amount of the penalty are not in any way related to what damage may have occurred to the environment by reason of the discharge. *See: United States v. W.B. Enterprises, Inc.,* 378 F.Supp. 420, 422–423 (S.D. N.Y.1974).

*Indicators of Congressional Intent*

In *Kennedy v. Mendoza-Martinez, supra,* the Supreme Court enumerated a series of "tests traditionally applied to determine whether an Act of Congress is penal or regulatory in [nature]":

[I] Whether the sanction involves an affirmative disability or restraint, [II] whether it has historically been regarded as a punishment, [III] whether it comes into play only on a finding of *scienter,* [IV] whether its operation will promote

---

**5.** Commandant Instruction 5922.11A is reprinted in the Appendix to *United States v. LeBeouf Brothers Towing Company, Inc.,* 377 F.Supp.

558 (E.D. La. 1974), reversed, 537 F.2d 149 (5th Cir. 1976), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977).

the traditional aims of punishment—retribution and deterrence, [V] whether the behavior to which it applies is already a crime, [VI] whether an alternative purpose to which it may rationally be connected is assignable for it, and [VII] whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in different directions. Absent conclusive evidence of congressional intent as to the penal nature of the statute, these factors must be considered in relation to the statute on its face. (Footnotes omitted.)

372 U.S., at 168–169, 83 S.Ct. at 567–568.

[I] "Whether the sanction involves an affirmative disability or restraint." Generally, imposition of monetary penalties does not involve the type of affirmative disability or restraint which occurs in the revocation of a previously granted governmental privilege. *See: Flemming v. Nestor, supra.* Nevertheless, the imposition of monetary penalties does "inflict a pocket-book deterrence or restraint on the recipient." *Atlas Roofing Company v. Occupational Safety and Health Review Commission, supra,* at 1001. Thus, because a sanction is used equally for both nonpunitive and punitive purposes, it offers little indication as to Congress' intent in this instance.

[II] "[W]hether it [the sanction] has historically been regarded as punishment." This indicator also gives little indication as to Congress' intent. Monetary penalties have traditionally been applied to both criminal and civil statutes.

[III] "[W]hether the sanction is activated only on a finding of *scienter.*" The statute, on its face, does not contain an element of ·*scienter.*[6] The fine is automatically assessed without regard to fault. Thus, at first blush, this factor seems to weigh heavily in favor of the regulatory nature of the penalty. However, the factors enumerated in the statute and the Commandant Instruction used in determining the amount

of the penalty indicate a *scienter* requirement. They speak of the "gravity of the violation," "degree of culpability," and whether the discharge was intentional or resulted from gross negligence.

Moreover, the statute dealing with the imposition of criminal penalties for the discharges of oil or hazardous substances similarly does not require *scienter.* *See:* 33 U.S.C. § 407 and 411; *United States v. White Fuel Corp.,* 498 F.2d 619 (1st Cir. 1974). Thus, this indicator lends a credence to a finding that the statute is criminal in nature.

[IV] "[W]hether the statute promotes the traditional aims of punishment—retribution and deterrence." In our view, this factor lends considerable weight to a finding that the civil penalty is actually criminal in nature. The statute and the administrative policies adopted pursuant thereto have the effect of retribution. The penalties are based on such factors as the gravity of the violation, the degree of culpability and the prior record of the party. The fact that a party acted in good faith, could not have avoided the discharge and, once it occurred, undertook clean-up measures immediately is to be given no consideration in relation to the "imposition or amount of a civil penalty."

We do not believe that the deterrence factor comes into play in any significant measure. The deterrence aspect of the statute as a whole is not found in sub-part (b)(6), but rather in the compensatory damage aspects of the statute.

Thus, we conclude that the retributive aspect of the civil penalty provision weighs heavily in favor of finding the statute penal in nature.

[V] "[W]hether the behavior to which it applies is already a crime." This factor falls clearly in favor of a finding that the statute is criminal in nature. Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 specifically prohibits the dis-

---

**6.** Prior to 1972, the civil penalty provision in question, then codified at 33 U.S.C. § 1161(b)(5), specifically included the element

of acting "knowingly" and provided for a maximum penalty of $10,000.

charge of refuse matter of any kind or description into the navigable waters of the United States. In *United States v. White Fuel Corporation, supra,* the court considered § 407 and held that a tank farm operator could properly be held criminally liable where oil found in navigable waters came from an accumulation of oil which had gathered under the operator's property and seeped into the water through indirect percolation. The court characterized § 407 as a "strict liability statute" and held that common law *mens rea* need not be alleged or proven.

The factual situation presented in *White Fuel Corporation* is almost entirely analogous to the circumstances presented in this case. It is, therefore, clear that the behavior to which the civil penalty applies is already a crime.

[VI] "[W]hether an alternative purpose other than punishment may rationally be ascribed to the sanction." We have heretofore discussed the remedial aspects of the civil penalty as they refer to the Pollution Fund. In addition to these factors, the Government urges that the penalty can be regarded as compensation to the United States for tortious damage to the environment. *See: United States v. W.B. Enterprises, Inc., supra.* We agree that the penalty could be regarded as such compensation, if the factors involved in determining the amount thereof reasonably related to the extent of damage to the environment. However, as previously noted, the factors are not addressed to this issue. Therefore, we decline to employ the Government's rationale.

[VII] "[W]hether [the sanction] appears excessive in relation to the alternative purpose assigned." The answer to this question is not easily resolved, because civil penalties are variable in nature. However, we believe that the factors employed in determining the amount of the penalty indicate a punitive nature. Imposition of penalties even in situations where the discharge is accidental, non-negligent and non-intentional, could be excessive. This is especially so, when the operator, in good faith, attempts to clean up, and, in fact, does clean up the discharge on his own initiative. Inasmuch as the amount of the penalty is correlated to the size of the business involved, a large business concern may very well be heavily penalized despite a lack of fault. Any subsequent clean up operations and attempted removal by the operator would not mitigate this penalty. Commandant Instruction 5922.11A, *supra.* In such a situation, the imposition of a large penalty would be excessive. Thus, we conclude that this indicator leans in favor of the penal nature of the Act.

We are reluctant to set aside a statutory enforcement scheme created under an Act of Congress, *Flemming v. Nestor, supra.* Nevertheless, we must recognize and abide the maxim that the privilege against self-incrimination should be liberally construed. *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). A detailed examination of the language of the statute, the administrative enforcement scheme, and the indicators of Congressional intent, lead us to conclude that the civil penalty found in 33 U.S.C. § 1321(b)(6) is criminal in nature.[7] For all of the reasons above related and discussed, we therefore hold that the compelled notification of discharge required to be filed with the Coast Guard pursuant to § 1321(b)(5) cannot be used in determining either liability for or the amount of civil penalties imposed under § 1321(b)(6). We do not, however, strike down the self-reporting requirements of § 1321(b)(5) or the statute requiring imposition of civil penalties under 1321(b)(6). In our view, it is permissible to assess civil penalties based on a discharge of oil or other hazardous substance under the Act, provided that the evidence used to establish the discharge is derived from a source wholly independent of the compelled disclosure required by § 1321(b)(5). *See: Harrison v.*

---

7. We were not presented with and we do not decide the question of whether 33 U.S.C. § 1321(b)(6) is criminal in nature for any purpose other than protecting an individual's right against self-incrimination under the Fifth Amendment to the United States Constitution.

*United States, supra; Wong Sun v. United States, supra.*[8]

Reversed and remanded for further proceedings consistent with this opinion in the collection suit, No. 76–0546E of the District Court; there being no need for injunctive relief as sought in No. 76–0303E, that cause shall be dismissed on remand.

---

**8.** We wish to emphasize that our holding today does not preclude the use of the notification of discharge filed pursuant to sub-part (b)(5) in a proceeding for assessment and determination of the civil penalties under sub-part (b)(6) where a corporation, rather than an individual, is involved. *See: United States v. Allied Towing Corporation,* 578 F.2d 978 (4th Cir. 1978); *United States v. LeBeouf Brothers Towing Company, Inc.,* supra.