919 F.2d 27
 32 ERC 1675, 59 USLW 2397, 21 Envtl.
L. Rep. 20,336
 CHEVRON, U.S.A., INC., Plaintiff-Counter-Defendant-Appellee,
v.
Paul YOST, Commandant, U.S. Coast Guard, W.F. Merlin,
Commander, U.S. Coast Guard Eighth Coast Guard District,
E.L. Ervin, District Hearing Officer, U.S. Coast Guard,
Eighth Coast Guard District, Defendants-Appellants,
and
United States of America, Counter Plaintiff-Appellant.
 No. 89-3845.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 12, 1990.
Rehearing and Rehearing En Banc
Denied Jan. 28, 1991.
 
 Vicki L. Plaut, Atty., Martin W. Matzen, Environment & Natural Resources Div., U.S. Dept. of Justice, Appellate Section, Washington, D.C., for defendants-appellants.
 M. Hampton Carver, Lindsay E. Lanaux, Milling Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff-counter-defendant-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, THORNBERRY, and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 Chevron U.S.A., Inc. persuaded the district court that because several accidental discharges of small quantities of oil did not cause actual injury to the environment, the United States Coast Guard should not have penalized it although the spills violated applicable regulations. Today we find that the violated regulations are adequately supported by Section 311 of the Federal Water Pollution Control Act, commonly known as the Clean Water Act, in that Congress has now given to the President authority to prohibit environmentally hazardous substances if he determines that they "may be harmful to the public health or welfare of the United States." (Emphasis supplied). 33 U.S.C. Secs. 1321(b)(3) and (4). We therefore reverse.
 
 I.
 
 2
 From June through September, 1986, on twelve separate occasions, Chevron accidentally discharged small quantities of oil into an open body of water; though small, the spills were large enough to cause an iridescent sheen. The Environmental Protection Agency has determined that discharges of oil in quantities large enough to create a sheen on the water "may be harmful to the public health or welfare of the United States." 40 C.F.R. Part 110 (1989). Under the Clean Water Act, once EPA has defined by regulation those discharges that "may be harmful," any violation of the EPA standard is a violation of the Act, 33 U.S.C. Sec. 1321(b)(3); must be reported by the owner or operator of the vessel or facility, 33 U.S.C. Sec. 1321(b)(5); and warrants the imposition of civil penalties. 33 U.S.C. Sec. 1321(b)(6)(A).
 
 
 3
 Chevron dutifully reported each of these twelve discharges to the United States Coast Guard, the enforcing agency. See 33 U.S.C. Sec. 1321(b)(6)(A). The Coast Guard promptly investigated each spill and in each case detected a sheen on the water's surface. If a sheen exists, Coast Guard procedures provide that the matter is to be turned over to a Coast Guard hearing officer who then sends the owner or operator of the facility or vessel a notice of violation, describing the range of penalties and proposing one, and giving the party the option to request a hearing. See 33 C.F.R. Subpart 1.07 (1989).
 
 
 4
 Chevron admits creating an oil sheen on these several occasions but denies liability for penalties under Section 311 of the Clean Water Act, insisting that it is entitled to prove the absence of actual injury as a result of the spills. At administrative hearings Chevron's experts testified that, despite any visible sheen, any impact on the ecosystem was at most de minimis. Nevertheless, the Coast Guard hearing officer assessed civil penalties ranging from $250 to $1000 for each of the twelve discharges, resulting in a total penalty of $8,800. The Commandant of the Coast Guard in turn denied Chevron's appeal, citing the mentioned EPA regulations. 40 C.F.R. Subpart 110.3.
 
 
 5
 Chevron then challenged the Commandant's decision in federal district court. On cross-motions for summary judgment, the district court entered judgment for Chevron, explaining from the bench its view that it was bound by this court's decision in United States v. Chevron Oil Co., 583 F.2d 1357 (5th Cir.1978) (Chevron I ). In Chevron I, applying a pre-1978 version of the Clean Water Act we held the EPA's sheen test was a rebuttable presumption of harm to the environment. The district court here took the same view of the regulations issued under the amended act.[1]
 
 II.
 
 6
 The district court accepted Chevron's claimed defense to a civil penalty proceeding under Section 311 of the Clean Water Act. The argument was that the oil spill, while creating a sheen, was not harmful and that EPA was not authorized to extend its reach beyond actual injury or at least that it did not do so. This position is not without force but we are persuaded of a different view. Indeed we agree with the government that Chevron's contention does not conform with the plain language of the Act, as amended in 1978; nor does it recognize the discretion delegated by the Act to the President and exercised by him through EPA regulations, or accord due deference to the EPA's interpretation of the Act, as required by Chevron U.S.A., Inc. v. National Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 A.
 
 7
 The Clean Water Act declared in 1970 that it is "the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States...." 33 U.S.C. Sec. 1161(b)(1), currently codified at 33 U.S.C. Sec. 1321(b)(1). The Act originally implemented this policy by prohibiting, and requiring the reporting of, all discharges of "harmful quantities" of oil, as well as other hazardous substances; the question of what amounts constituted "harmful quantities" was left to the determination of the President. 33 U.S.C. Secs. 1161(b)(2) and (3), currently codified at 33 U.S.C. Secs. 1321(b)(3) and (4).
 
 
 8
 The President delegated this rulemaking authority, first to the Secretary of the Interior, and later to the Environmental Protection Agency, where it now resides. The Secretary, through the now-defunct Federal Water Quality Administration, promulgated what has become known as the "sheen" test for oil discharges. 18 C.F.R. Part 610; 35 Fed.Reg. 14306-14307 (September 11, 1970). This regulation provided that any oil spill causing "a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or caus[ing] a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines" was determined to be harmful to the public health or welfare of the United States. Id., later recodified at 40 C.F.R. Part 110 (1989).[2]
 
 
 9
 Several early court opinions, reading the sheen regulation against its statutory base of actual injury, concluded that it did not prohibit de minimis discharges, not actually harmful. See United States v. Boyd, 491 F.2d 1163, 1167 (9th Cir.1973); Ward v. Coleman, 423 F.Supp. 1352, 1358 (W.D. Okla.1976), rev'd, 598 F.2d 1187 (10th Cir.1979), rev'd, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). Other courts suggested that the President had not designated specific "times, locations, circumstances, and conditions" as required by the Act at that time. See Manufacturing Chemists Ass'n v. Costle, 455 F.Supp. 968 (W.D. La.1978). Congress responded in 1978 by strengthening the President's power to prohibit discharges of both oil and other hazardous substances. As revised, Section 311 of the Act empowered the President to prohibit any discharge of oil or hazardous substances that the President concluded "may be harmful to the public health or welfare of the United States." 33 U.S.C. Secs. 1321(b)(3) and (4). Congress also eliminated the requirement that the President limit the prohibitions to certain "times, locations, circumstances, and conditions." 33 U.S.C. Sec. 1321(b)(4).
 
 
 10
 Following the 1978 amendments and in response to criticism of the sheen test, the EPA considered alternative measures for triggering the Act's reporting and penalty provisions, e.g., measures tying the Act's provisions to a specific volume of discharge. The EPA reviewed extensive public comments, but in 1987 again promulgated the sheen test. 40 C.F.R. Subpart 110.3.
 
 
 11
 In sum, the agency may both proscribe incipient injury and measure its presence by a test that avoids elaborated inquiry. While it is apparent that such an approach sometimes overregulates, it is equally apparent that this imprecision is a trade-off for the administrative burden of case-by-case proceedings.
 
 B.
 
 12
 Chevron successfully argued below that this case is controlled by this court's decision in Chevron I, 583 F.2d at 1357. In Chevron I we held that the sheen regulation promulgated under the pre-1978 version of the Act created only a rebuttable presumption of harm. Id. at 1363-64. This interpretation of the Act, we held, followed from Congress's decision not to ban all oil spills, but only those that occur in harmful quantities. Id. at 1362-63.
 
 
 13
 In only one other case has a court actually considered the applicability of Chevron I 's reasoning to the amended Act: Orgulf Transport Co. v. United States, 711 F.Supp. 344, 347 (W.D.Ky.1989).[3] The Orgulf court observed:
 
 
 14
 [T]hat Congress could have prohibited all discharges through a specific declaration and chose not to do so does not negate the effect of the amendment, a common sense reading of which illustrates that Congress chose to prohibit discharges which might not be harmful. Whether a spill resulted in actual harm to the environment is irrelevant to the determination of whether Section 311's prohibition of discharges of oil in quantities which may be harmful has been violated. The only pertinent inquiry is whether the spill was in a quantity which may be harmful as determined by the EPA. Because EPA has determined that a spill of oil which creates a sheen is a quantity which 'may be harmful,' such a spill is subject to the penalty provisions of 33 U.S.C. Sec. 1321 and 40 CFR Part 110.3.
 
 
 15
 Orgulf, 711 F.Supp. at 347 (emphasis in original). This statement accords with our view that the 1978 amendments gave the EPA broader authority to regulate small spills. With these changed circumstances, we conclude that Chevron I does not control this case.
 
 C.
 
 16
 Finally, we decided Chevron I before the Supreme Court held that such agency regulations should be accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron v. NRDC, 467 U.S. at 844, 104 S.Ct. at 2782. See also National Grain and Feed Ass'n v. OSHA, 866 F.2d 717, 733 (5th Cir.1988) (only where congressional intent is pellucid are we entitled to reject reasonable agency interpretation).
 
 
 17
 REVERSED.
 
 
 
 [1]
 Our review of a grant of summary judgment is de novo. Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1015-16 (5th Cir.1990)
 
 
 [2]
 The single exception to these regulations was for "discharges from a properly functioning vessel engine," which were not deemed to be harmful. 18 C.F.R. Subpart 610.6 (1970) (superseded by 40 C.F.R. Subpart 110.7 (1988))
 
 
 [3]
 Chevron cites several other cases in support of its argument that the responsible party has a right to rebut the contention that a spill "may be harmful," but none of these cases considers the effect of the 1978 amendments. See United States v. Healy Tibbitts Const. Co., 713 F.2d 1469, 1475 (9th Cir.1983); United States v. National Wood Preservers, Civ. Action No. 84-0458, 1986 WL 12761 (E.D. Pa. Nov. 7, 1986); United States v. Chotin Transp., Inc., 649 F.Supp. 356 (S.D. Ohio 1986)